[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-12547

_____

In Re: Mosaic Management Group, Inc.,

Debtor.

_____

UNITED STATES TRUSTEE REGION 21,

Plaintiff-Appellee
Cross-Appellant,

versus

BAST AMRON LLP,

Defendant-Appellant
Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

D.C. Docket No. 16-bk-20833-EPK

_____

Before JORDAN, BRASHER, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Quarterly fees are collected pursuant to 28 U.S.C. § 1930 in each quarter of a chapter 11 bankruptcy based on the amount of disbursements made.  The United States Trustee collects the fees in most districts in the country, while an arm of the Judicial Conference does so in six.  This case is a challenge to the 2017 legislation that increased the quarterly fee chargeable for the largest chapter 11 bankruptcies, those distributing $1 million or more in a given quarter.  We must determine whether this increase applied to disbursements in a case pending at the time the law was enacted, whether the law violated due process rights, and whether the law is one on the subject of bankruptcies or is a tax such that a constitutional uniformity requirement applies, which in turn requires us to consider whether the law is nonuniform.  The bankruptcy court determined that the increased fees applied to the instant case and that the only constitutional violation was a partial uniformity issue.  After thorough review and with the benefit of oral argument, we conclude that the 2017 legislation applied to this pending

bankruptcy case without a due process violation and without offending a uniformity requirement, the only source of which is the Bankruptcy Uniformity Clause.

## I. BACKGROUND

Debtors Mosaic Management Group, Inc., Mosaic Alternative Assets, Ltd., and Paladin Settlements, Inc. operated in the life settlement industry, buying life insurance policies from insureds, and then selling interests in those policies to investors. In 2008, the debtors filed for chapter 11 bankruptcy in the Southern District of Florida, a "UST district" in which the U.S. Trustee program operates. "The six federal judicial districts in Alabama and North Carolina are the only districts in the country that have a Bankruptcy Administrator" ("BA districts") and are not a part of the U.S. Trustee program, though the Administrator (part of the judicial branch) performs similar tasks as the U.S. Trustee (part of the executive branch). *L. Sols. of Chi. LLC v. Corbett*, 971 F.3d 1299, 1307 n.3 (11th Cir. 2020).

On June 6, 2017, the bankruptcy court entered an order confirming a joint chapter 11 plan. Under the plan, virtually all the debtors' assets were transferred to an "Investment Trust" to which Margaret J. Smith, predecessor to Appellant in this case, was appointed as "Investment Trustee." Smith, as Investment Trustee, managed the Mosaic Investment Trust for the benefit of investors and creditors with allowed claims. Pursuant to the bankruptcy plan and confirmation order, the debtors were required to "pay the United States Trustee the appropriate sum required pursuant to 28

U.S.C. § 1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. §1930(a)(6), based upon all post-confirmation disbursements." Such payments would be required until the earlier of the closing of the case or the entry of an order dismissing the case or converting it to another chapter under the Bankruptcy Code.

At the time the bankruptcy plan was confirmed in June 2017, Section 1930(a)(6) provided,

> In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first. . . . The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed.

28 U.S.C. § 1930(a)(6) (2012). The minimum fee set by the statute was "$325 for each quarter in which disbursements total less than $15,000," and gradually increased based on the larger the amount of disbursements up to "$30,000 for each quarter in which disbursements total more than $30,000,000."[1]  *Id.* Section 1930(a)(7) stated

---

[1] The remainder of the fee schedule in § 1930(a)(6) was as follows:

> $650 for each quarter in which disbursements total $15,000 or more but less than $75,000; $975 for each quarter in which disbursements total $75,000 or more but less than $150,000; $1,625 for each quarter in which disbursements total $150,000

20-12547          Opinion of the Court          5

that "[i]n districts that are not part of a United States trustee region," *i.e.*, BA districts, "the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection." 28 U.S.C. § 1930(a)(7) (2012).

A few months later, on October 26, 2017, Congress enacted the Bankruptcy Judgeship Act of 2017 (the "2017 Amendment"), which temporarily increased fees for the largest debtors in chapter 11 cases to address a dwindling U.S. Trustee program budget resulting from declining bankruptcy filings and to fund bankruptcy judgeships. Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72,

---

or more but less than $225,000; $1,950 for each quarter in which disbursements total $225,000 or more but less than $300,000; $4,875 for each quarter in which disbursements total $300,000 or more but less than $1,000,000; $6,500 for each quarter in which disbursements total $1,000,000 or more but less than $2,000,000; $9,750 for each quarter in which disbursements total $2,000,000 or more but less than $3,000,000; $10,400 for each quarter in which disbursements total $3,000,000 or more but less than $5,000,000; $13,000 for each quarter in which disbursements total $5,000,000 or more but less than $15,000,000; $20,000 for each quarter in which disbursements total $15,000,000 or more but less than $30,000,000 . . . .

28 U.S.C. § 1930(a)(6) (2012). This fee schedule was established by legislation enacted in 2007, when Congress increased fees from the amounts previously set in 1996. Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, sec. 213(b), § 1930, 121 Stat. 1844, 1914.

sec. 1004(a), § 1930(a)(6), 131 Stat. 1224, 1232; H.R. Rep. No. 115-130, at 7–9 (2017).  From 2018 through 2022, if the U.S. Trustee System Fund had a balance of less than $200 million in the prior fiscal year, the 2017 Amendment provided that the "quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000."  Pub. L. No. 115-72, sec. 1004(a), § 1930(a)(6), 131 Stat. at 1232.  Otherwise, the existing fee schedule remained.

In BA districts, where the Judicial Conference was authorized to "require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6)," 28 U.S.C. § 1930(a)(7) (2012), the 2017 Amendment's fee increase was not immediately implemented.  In September 2018, the Conference approved the new quarterly fee provision "for cases filed on or after October 1, 2018 for any fiscal year in which the U.S. Trustee Program exercises its authority under that statute, and pursuant to any future extensions of that or similar authority."  Judicial Conference of the U.S., Report of the Proceedings of the Judicial Conference of the United States 11–12 (Sept. 2018).

The Investment Trust paid the increased fees imposed by the 2017 Amendment, having distributed between $750,000 and $10,000,000 for each of the quarters in fiscal year 2018 and the first two quarters of 2019.  The increased fees resulted in $125,816.69 or 3.5 times more in fees paid than would have been required pursuant to § 1930(a)(6) prior to the 2017 Amendment.

20-12547                Opinion of the Court                7

In September 2019, Smith filed a motion requesting a determination of the Investment Trust's quarterly fee liability under § 1930(a)(6) and reimbursement of already paid fees that exceeded the amount that would have been owed prior to the 2017 Amendment. Smith argued that the Amendment did not apply to cases that had been filed or had their plans confirmed before the Amendment took effect, that it violated the Due Process Clause of the Fifth Amendment, and that it violated the constitutional tax and bankruptcy uniformity requirements because the increased fees had only been imposed in UST districts and not in BA districts. Nancy J. Gargula, the United States Trustee for Region 21,[2] opposed the motion.

The bankruptcy court largely denied Smith's motion but granted it in part. The court held that § 1930(a)(6) as amended was mostly uniform—whether either the tax or bankruptcy constitutional requirement applied—because the overarching purpose of the 2017 Amendment was to eliminate a funding shortfall in the UST system and develop a reasonable reserve, and it did so by only effecting a fee increase in UST districts. The court explained that the Amendment created a partial uniformity problem, however, because 2% of the fees collected in UST districts were to be paid to

---

[2] Region 21 encompasses the district from which this case originated, the Southern District of Florida, as well as the rest of the districts in Florida and the districts in Georgia, Puerto Rico, and the U.S. Virgin Islands. 28 U.S.C. § 581(a)(21).

the general U.S. Treasury fund (hereinafter the "2% allocation"), which offset the cost of a temporary bankruptcy judgeship in a BA district.  As a remedy, the court ordered the U.S. Trustee to credit Smith as Investment Trustee a sum equal to 2% of the quarterly fees paid since January 1, 2018.  Otherwise, the court rejected Smith's other challenges to the increased quarterly fees, holding that the 2017 Amendment applied prospectively to disbursements made after the effective date of the Amendment regardless of when the case had been filed or if a plan had been confirmed and that there was no due process violation.

On May 20, 2020, the parties filed a joint certification for direct appeal in the district court pursuant to 28 U.S.C. § 158(d)(2)(A) and Federal Rule of Bankruptcy Procedure 8006(c).  This Court authorized direct appeal of the matter on July 10, 2020.

During the pendency of this appeal, Smith, the Trustee of the Mosaic Investment Trust (pursuant to the order of the bankruptcy court), has assigned all of the Investment Trust's rights, title, and interests in the current appeal to an investment group, Bast Amron, LLP.  *See* D.E. 68.  Pursuant to an order in this court, Bast Amron, LLP, has been substituted as the Appellant-Cross Appellee in this appeal.  *See* D.E. 69.  Accordingly, in this opinion, we will hereinafter refer to this party as Appellant-Cross Appellee (or simply as Appellant) or as Bast Amron.  Similarly, Gargula, the United States Trustee for Region 21, has now been succeeded in office and her successor, Mary Ida Townson, has become the Appellee-Cross Appellant in this appeal.  *See* D.E. 63; *see also* Fed. R.

20-12547                Opinion of the Court                9

App. P. 43(c)(2).  In this opinion, we will hereinafter refer to this party as Appellee-Cross Appellant (or simply as Appellee) or as Region 21 United States Trustee.

## II.  DISCUSSION

Each of the two parties challenges the bankruptcy court's decision regarding the quarterly fees owed to the U.S. Trustee by the Investment Trust.  These appeals require us to address the following: (a) whether the quarterly fee increase provision in the 2017 Amendment was properly applied to Bast Amron's case as one that was pending at the time of, and had its plan confirmed prior to, the law's enactment; (b) whether the Amendment violated the substantive component of the Due Process Clause of the Fifth Amendment; (c) whether it was a valid exercise of Congress' power "[t]o lay and collect Taxes, Duties, Imposts and Excises" that "shall be uniform throughout the United States," U.S. Const. art. I, § 8, cl. 1; and (d) whether it was a valid exercise of Congress' power "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States," *id.* art. I, § 8, cl. 4.  We address in turn each of these purely legal questions *de novo.  See In re Barrett*, 543 F.3d 1239, 1241 (11th Cir. 2008) ("In considering this appeal, because the facts are undisputed, we will review the bankruptcy court's conclusions of law *de novo*.").

A.  *The 2017 Amendment was Properly Applied to this Case*

Bast Amron argues that the bankruptcy court erred in holding that the 2017 Amendment raised fees in the Investment Trust's

case.  It argues that the Amendment did not explicitly state that the fee increase for the largest chapter 11 bankruptcies applied retroactively and that the increased fees affected the Investment Trust's and its creditors' vested rights and expectations, and thus the presumption against retroactivity requires that the Amendment not apply.  Because Congress clearly expressed the statute's proper temporal reach, and because the Trust made disbursements within that reach, we hold that the bankruptcy court correctly held that the increased fees imposed by the 2017 Amendment apply in this case.

> 1.  The initial inquiry is whether Congress expressly prescribed a statute's temporal reach and, if so, the presumption against retroactivity does not apply, and we must apply the statute as written.

The Supreme Court has outlined a clear framework for analysis "when an objection is made to applying a particular statute said to affect a vested right or to impose some burden on the basis of an act or event preceding the statute's enactment." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37, 126 S. Ct. 2422, 2428, 165 L. Ed. 2d 323 (2006).  "We first look to 'whether Congress has expressly prescribed the statute's proper reach,' and in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying 'our normal rules of construction.'" *Id.* (citations omitted) (first quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S. Ct. 1483, 1505, 128 L. Ed. 2d 229 (1994); then quoting *Lindh v. Murphy*, 521

20-12547                Opinion of the Court                11

U.S. 320, 326, 117 S. Ct. 2059, 2063, 138 L. Ed. 2d 481 (1997)).  Only if we cannot ascertain the proper temporal reach of a statute do "we ask whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment,'" and if so, the presumption against retroactivity applies to construe the statute as inapplicable. *Id.* (alterations in original) (quoting *Landgraf,* 511 U.S. at 278, 114 S. Ct. at 1504).

The question in the first instance is not simply whether Congress explicitly used the word "retroactive" or "pending," and if neither was used, then we must analyze the retroactive consequences.  Instead, "even absent explicit statutory language mandating retroactivity, laws may be applied retroactively if courts are able to discern '*clear* congressional *intent* favoring such a result.'" *United States v. Olin Corp.*, 107 F.3d 1506, 1512–13 (11th Cir. 1997) (quoting *Landgraf,* 511 U.S. at 280, 114 S. Ct. at 1505).  Nor is the initial question guided by the presumption against retroactivity.  "It is not until a statute is shown to have no firm provision about temporal reach but to produce a retroactive effect when straightforwardly applied that the presumption has its work to do." *Fernandez-Vargas*, 548 U.S. at 40, 126 S. Ct. at 2430 (citing *Landgraf,* 511 U.S. at 280, 114 S. Ct. at 1505).  This structured analysis "allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule

against which to legislate." *Landgraf*, 511 U.S. at 273, 114 S. Ct. at 1501.

> 2. Congress expressly prescribed the temporal reach of the 2017 Amendment's provision that increased quarterly fees, and that reach included the Investment Trust's disbursements in 2018 and the first quarters of 2019.

Bast Amron's challenge fails at the first step of this *Landgraf* analysis. The 2017 Amendment clearly provides for the temporal reach of the quarterly fee amendments it makes in a section entitled "Application of Amendments":

> The amendments made by this section shall apply to quarterly fees payable under section 1930(a)(6) of title 28, United States Code, as amended by this section, for disbursements made in any calendar quarter that begins on or after the date of enactment of this Act.

Pub. L. No. 115-72, sec. 1004(c), § 1930, 131 Stat. at 1232. The trigger is thus future disbursements made in the quarters after the date of enactment. Because the 2017 Amendment was enacted on October 26, 2017, disbursements made in the first quarter after enactment, the quarter starting on January 1, 2018, triggered the higher fees. Nothing states that fees are increased based on when the bankruptcy case was filed or whether a plan has been confirmed. Instead, Congress clearly indicated its intent to have the 2017 Amendment and the increased fee provision apply to "disbursements made in any calendar quarter that begins on or after the date of enactment." *Id.*; *see In re Cir. City Stores, Inc.*, 996 F.3d 156, 168

(4th Cir. 2021) ("The [2017] Amendment thus makes clear that Congress intended for the increase to apply to all Chapter 11 quarterly fees due in January 2018 or thereafter, without regard to the case's filing date."), *cert. granted sub nom.*, *Siegel v. Fitzgerald*, No. 21-441, 2022 WL 89272 (U.S. Jan. 10, 2022).

The fee increase provision itself also indicates Congress' intent and provides for additional temporal language, stating the fee increase applies "[d]uring each of fiscal years 2018 through 2022" if certain conditions are met. Those conditions are whether "the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000," and, for the individual debtor, whether "disbursements equal or exceed $1,000,000" for the quarter in question. Pub. L. No. 115-72, sec. 1004(a)(2), § 1930(a)(6), 131 Stat. at 1232. This further supports that it is disbursements made in the first quarter after enactment and thereafter that trigger the statute.

The clear reliance of the 2017 Amendment's application on future disbursements is bolstered by § 1930(a)(6)'s existing language, which tied the payment of fees to "in each case under chapter 11 . . . for each quarter . . . until the case is converted or dismissed."[3]  28 U.S.C. § 1930(a)(6) (2012). There was nothing in the

---

[3] The 2017 Amendment split § 1930(a)(6) into (a)(6)(A) and (a)(6)(B). Section 1930(a)(6)(A) retained the existing language, including that quoted in the text, and the fee schedule but had added to it "Except as provided in subparagraph (B)." Pub. L. No. 115-72, sec. 1004(a)(1), § 1930, 131 Stat. at 1232. Section

14                    Opinion of the Court                  20-12547

language of § 1930(a)(6) or the 2017 Amendment that considered
when a particular case was filed or when a plan was confirmed.[4] If
disbursements were made in any chapter 11 case in the quarter

---

1930(a)(6)(B) included the fee increase provision at issue in this case that de-
fined the fee as 1% of disbursements or $250,000 for quarterly disbursements
of $1,000,000 or more if the conditions described above were met. Pub. L. No.
115-72, sec. 1004(a)(2), § 1930, 131 Stat. at 1232.

[4] We reject the argument raised at oral argument that the 2017 Amendment
does not apply to pending cases because the introductory phrase in § 1930(a)
read and continues to read, "The parties commencing a case under title 11
shall pay . . . the following filing fees," implying that "commencing a case" is
the trigger for quarterly fees, including the increased fees. Smith did not raise
this argument in her briefing and thus waived it. *See Walker v. City of Cal-
houn, GA*, 901 F.3d 1245, 1280 n.10 (11th Cir. 2018) (Martin, J., concurring in
part and dissenting in part) ("[T]his Court's longstanding rule is that argu-
ments not briefed to the court and raised for the first time at oral argu-
ment are deemed abandoned."). Even so, nothing in the introductory clause
negates the 2017 Amendment's application to "disbursements made in any cal-
endar quarter that begins on or after the date of enactment." And § 1930(a)(6)
had its own, separate introductory phrase, which stated, "In addition to the
filing fee paid to the clerk, a quarterly fee shall be paid to the United States
trustee." This introductory phrase indicates that quarterly fees are separate
from filing fees since they are "[i]n addition to" filing fees and paid to a differ-
ent entity. Finally, the only authority offered at oral argument was the district
court decision in *USA Sales, Inc. v. Office of the United States Trustee*, which
only used the "commencing a case" language to analyze which conduct was
affected by retroactive application after the court concluded that Congress did
not prescribe the reach of the 2017 Amendment in the first step of the *Landgraf*
analysis. 532 F. Supp. 3d 921, 934, 936–37 (C.D. Cal. 2021). We conclude the
opposite on the first step of the analysis for the reasons stated above and thus
do not need to reach the subsequent question in the *Landgraf* analysis regard-
ing retroactive effects. *But see infra* note 9.

starting January 1, 2018, the increased fees applied.  The language
of the "Application of Amendments" provision, the increased fee
provision, and the existing language of § 1930(a)(6) are clear, and
there is no plausible construction of that language which would in-
dicate a congressional intent that the 2017 Amendment should ap-
ply only to bankruptcy cases which were initially filed after the date
of enactment.[5]

---

[5] When asked about this clear language during oral argument, counsel for Ap-
pellant argued that the Supreme Court in *Landgraf* held that the effective date
of the statute does not determine this issue.  But the Supreme Court did not
go so far.  When analyzing the only provision that spoke directly to the ques-
tion regarding retroactive application of 1991 amendments to Title VII—a pro-
vision that stated, "Except as otherwise specifically provided, this Act and the
amendments made by this Act shall take effect upon enactment"—the *Land-
graf* Court explained that "[t]hat language does not, by itself, resolve the ques-
tion" because "[a] statement that a statute will become effective on a certain
date does not even arguably suggest that it has any application to conduct that
occurred at an earlier date."  511 U.S. at 257, 114 S. Ct. at 1493 (footnote omit-
ted).  The Court proceeded to analyze specific effectiveness language particu-
lar to certain substantive provisions of the statute.  *Id.* at 258, 114 S. Ct. at 1493.
It concluded that Congress did not prescribe the reach of the amendments.  *Id.*
at 280, 114 S. Ct. at 1505.  What the Supreme Court did not do, however, was
announce a rule that would require us to bypass relevant temporal language
in a statute.  Indeed, it emphasized just the opposite, that we must "respon[d]
to the language of the statute" and consider that "[e]ven absent specific legis-
lative authorization, application of new statutes passed after the events in suit
is unquestionably proper in many situations."  *Id.* at 273, 114 S. Ct. at 1501.
The Supreme Court has since further explained that "in the absence of lan-
guage as helpful as" language that "expressly prescribed the statute's proper
reach," "we try to draw a comparably firm conclusion about the temporal
reach specifically intended by applying our normal rules of construction."

16                    Opinion of the Court                    20-12547

3. Comparisons to the amendments made to chapter 12 of
   the Bankruptcy Code in the 2017 Amendment and to
   § 1930(a)(6) in 1996 do not make the 2017 fee increase's
   application to future disbursements any less clear.

Despite this clear text, Bast Amron asks us to draw two negative inferences she argues suggest the 2017 Amendment's inapplicability to pending cases:  first, from another provision of the 2017 Amendment and, second, from the 1996 amendments to § 1930(a)(6).  Neither inference is warranted.

First, the 2017 Amendment, in addition to the fee increase in chapter 11 cases, made amendments to chapter 12 of the Bankruptcy Code—the chapter applicable to family farmers and fisherman—with an "effective date" subsection stating such amendments apply in cases "pending on the date of enactment . . . in which the plan under chapter 12 . . . has not been confirmed on the date of enactment" and a discharge order has not been entered. Pub. L. No. 115-72, sec. 1005(c), 131 Stat. at 1234.  The chapter 12 amendments also expressly applied to bankruptcy cases commenced on or after the date of enactment.  *Id.*  This plain

_____

*Fernandez-Vargas*, 548 U.S. at 37, 126 S. Ct. at 2428 (internal quotation marks omitted) (citations omitted).  The effective date provision in *Landgraf* was ambiguous and failed to indicate much about Congress' intent.  This is in clear contrast to the 2017 Amendment's "Application of Amendments" section, the fee increase's clear tie to disbursements on and after January 1, 2018, within a specific four-year window, and the existing language of § 1930(a)(6) tying quarterly fees to disbursements.

application to pending chapter 12 cases contrasts with the chapter 11 quarterly fee amendments, says Bast Amron. But chapter 11 and chapter 12 and their respective amendments "address wholly distinct subject matters"; thus, in comparing to the chapter 12 amendments, a "negative inference does not arise from the silence" of the chapter 11 amendments. See Martin v. Hadix, 527 U.S. 343, 356, 119 S. Ct. 1998, 2005, 144 L. Ed. 2d 347 (1999) ("Because §§ 802 and 803 address wholly distinct subject matters, the same negative inference does not arise from the silence of § 803."); In re Buffets, L.L.C., 979 F.3d 366, 375 n.5 (5th Cir. 2020) (stating the court "decline[d] to draw that negative inference" regarding the application of the chapter 12 amendments). Furthermore, several courts have correctly highlighted why Congress included the plain language regarding the application of chapter 12 amendments to pending cases: the 2017 Amendment expanded the scope of chapter 12 discharge and thus Congress needed to express its intent to preserve preexisting discharge orders that established vested rights. See Buffets, 979 F.3d at 375 n.5. Moreover, the changes to chapter 12 did not involve an increase in fees, and thus Congress could not express its clear intention, as here, by simply saying that the increased fees applied to disbursements made in quarters beginning after the effective date. See Pub. L. No. 115-72, sec. 1005(a), (b), §§ 1232, 1222(a), 1228, 1229, 131 Stat. at 1232–34. Thus, this negative inference is unwarranted.

Second, Bast Amron argues that amendments to § 1930(a)(6) in 1996 show that Congress knew how to make the application of

amendments to pending cases explicit in 2017. It is true that later, in September 1996, Congress did expressly make the 1996 fee increase applicable to pending cases. However, the initial January 1996 legislation which imposed the 1996 fee increase was written in a roundabout way that confused courts with respect to whether it applied to pending cases. By all accounts the January 1996 amendments created confusion in the courts regarding whether the expansion of quarterly fees beyond the confirmation of a plan applied to cases then pending.[6] Congress thus had to fix the problem, which it did later in September 1996, with clear language.[7] By

---

[6] See In re Huff, 207 B.R. 539, 541 nn.4–5 (Bankr. W.D. Mich. 1997) (citing five-to-four split of decisions in favor of first 1996 amendment not applying to pending cases); see also In re Junior Food Mart of Ark., Inc., 201 B.R. 522, 524 (Bankr. E.D. Ark. 1996) (applying statute to pending cases); In re Flatbush Assocs., 198 B.R. 75, 77 n.1 (Bankr. S.D.N.Y. 1996) (same).

[7] The second amendment, enacted on September 30, 1996, amended the same public law as the prior 1996 law. Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, sec. 109(d), § 1930, 110 Stat. 3009, 3009-19. The September 1996 amendment clarified that "the fees under 28 U.S.C. 1930(a)(6) shall accrue and be payable from and after January 27, 1996, in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans." Id. sec. 109(d), § 1930, 110 Stat. at 3009-19. It also amended the quarterly fee schedule in § 1930(a)(6), partially replacing the one established in 1991; the minimum fee remained ($500 for $15,000 in disbursements or less) but the maximum fee increased to $10,000 for disbursements of $5 million or more and seven graduated fee levels based on disbursements between the minimum and maximum were defined (replacing the existing three). Id. sec. 109(a), § 1930(a), 110 Stat. at 3009-18. This schedule remained until it was amended in 2007. See supra note 1.

contrast, in 2017, Congress used clear language right away—*i.e.*, the clear language regarding its application analyzed above—and thus there was no need for further amendment. *See Cir. City Stores*, 996 F.3d at 168 ("Unlike the 1996 amendment, the 2017 Amendment plainly applies to all disbursements made after its effective date."). We conclude that a negative inference is not warranted from the 1996 amendment.

Rather than draw a negative inference from the 1996 legislation, we believe that the more recent amendment in 2007 imposing fee increases indicates that Congress understood in 2017 that it could increase fees with immediate effect without using the word "pending." That is, when Congress increased fees in 2007 (the "2007 Amendment"), it provided that the new fees "shall take effect January 1, 2008, or the date of the enactment of this Act, whichever is later." Pub. L. No. 110-161, sec. 213(b), § 1930, 121 Stat. at 1914; *see supra* note 1. Apparently recognizing that the 2007 increase was routinely applied to pending cases, Bast Amron's only suggestion is that the 2007 increase was modest in size compared to 2017. This distinction does not compel the result it urges. Instead, "[i]n making its most recent change to the quarterly fees [the 2017 Amendment], Congress operated under this widespread understanding that fee increases apply to postenactment disbursements in pending cases." *Buffets*, 979 F.3d at 374.

4. The 2020 Amendment does not change the analysis.

After briefing was completed in this case, Congress enacted the Bankruptcy Administration Improvement Act of 2020 (the

"2020 Amendment") in January 2021, setting the fee for quarters with disbursements of at least $1 million to 0.8% of the disbursements but not more than $250,000 and for quarters with disbursements of less than $1 million to 0.4%.  Pub. L. No. 116-325, sec. 3(d)(1), § 1930(a), 134 Stat. 5086, 5088.  Congress provided that amendments made to the quarterly fee provisions apply to

> (i) any case pending under chapter 11 of title 11, United States Code, on or after the date of enactment of this Act; and

> (ii) quarterly fees payable under section 1930(a)(6) of title 28, United States Code, as amended by subsection (d), for disbursements made in any calendar quarter that begins on or after the date of enactment of this Act.

*Id.* sec. 3(e), 134 Stat. at 5089.  Subparagraph (ii) of this application provision mimics the same clear language from the 2017 Amendment, but subparagraph (i) also explicitly states that the new fees apply to "any case pending."  *Id.*  We decline another opportunity to draw a negative inference based on the 2020 Amendment.  We do not believe that any negative inference from the 2020 Amendment is sufficient to overcome the language of the 2017 Amendment clearly stating the congressional intent that the 2017 Amendment "shall apply to quarterly fees payable under section 1930(a)(6) . . . for disbursements made in any calendar quarter that begins on or after the date of enactment of this Act."  Moreover, although there was nothing like the confusion in the case law addressing whether the 2017 Amendment applied to pending cases as

compared to the confusion in 1996, there were several lower court judges who had held that the 2017 Amendment did not apply to pending cases.[8] Thus, it is not surprising that, in the 2020 Amendment, Congress wanted to double down in expressing its intentions to avoid any remaining doubt.

> 5.  We conclude that the 2017 Amendment applies to this case.

In sum, we conclude that Bast Amron's retroactivity challenge fails at the first step of the *Landgraf* analysis. We conclude that the language of the 2017 Amendment expressed a clear congressional intent that the fee increase "shall apply to quarterly fees payable under Section 1930(a)(6) . . . for disbursements made in any calendar quarter that begins on or after" January 1, 2018. We reject Bast Amron's several arguments that some negative inference should be drawn to overcome this clearly expressed intention. Because Congress' intent was clear that the 2017 Amendment increased fees for future disbursements made after the statute's enactment, we need not reach the subsequent question in the *Landgraf* analysis of whether there are any retroactive consequences

---

[8] *USA Sales, Inc.*, 532 F. Supp. 3d at 935–37, is the only lower court decision—holding that the 2017 Amendment is not applicable to pending cases—that has not been either reversed or abrogated. However, the bankruptcy court in *In re Buffets, LLC*, 597 B.R. 588 (Bankr. W.D. Tex. 2019), had so held before being reversed by the Fifth Circuit, as had the *In re Life Partners Holdings, Inc.*, 606 B.R. 277 (Bankr. N.D. Tex. 2019), before being abrogated by the Fifth Circuit in *Buffets*.

warranting application of the presumption against retroactivity.[9] Therefore, pursuant to the terms of the 2017 Amendment, the fee increase was properly applied to this case.  The remainder of this opinion considers arguments that the 2017 Amendment was unconstitutional.

---

[9] Although we need not actually decide the retroactive effects issue, *i.e.*, the second step of the *Landgraf* analysis, we note considerable doubt that there are retroactive consequences even if there was some ambiguity as to the statute's reach.  As stated, the clear language of the Amendment applies the fee increase to future disbursements; this is a *prospective* effect.  Looking retrospectively, the increased fees do not "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280, 114 S. Ct. at 1505.  When the bankruptcy petition was filed in 2008 and the plan confirmed in early 2017, the debtors and creditors may have had particular expectations of the magnitude of quarterly fees, but "they always expected to pay some of those fees," and "[t]he mere upsetting of their expectations as to amounts owed based on *future* distributions does not make for a retroactive application." *Buffets*, 979 F.3d at 375; *Cir. City Stores*, 996 F.3d at 169 ("Although . . . the Amendment increases the quarterly fees that large Chapter 11 debtors will pay, such debtors were reasonably expected to pay fees pursuant to some formula.").  "Nor does [the Amendment] encumber vested property rights under confirmed plans, as some degree of 'variability in the final amount available to plan distributees' is expected in complex bankruptcies." *Buffets*, 979 F.3d at 375 (citation omitted) (quoting *In re CF & I Fabricators Utah, Inc.*, 150 F.3d 1233, 1239 (10th Cir. 1998)).  Indeed, the parties to the confirmation plan could not have reasonably expected quarterly fees to forever remain constant given fees had increased effective the same year the bankruptcy petition was filed in 2008 and just over a decade earlier in 1996, and the increased fees always applied to pending cases.

20-12547                Opinion of the Court                23

B. *The 2017 Amendment Does Not Violate Substantive Due Process*

In addition to the retroactive arguments, Bast Amron challenges the 2017 Amendment on substantive due process grounds. It argues that vested rights were impaired with an illegitimate legislative purpose by way of irrational means and without notice. In particular, Bast Amron argues that the increased fees have been collected to create a surplus and thus are excessive when compared with the needs of the U.S. Trustee system, that the increased fees are shouldered by current debtors for the benefit of future debtors who will not have to pay the higher fees once the statutory period expires, and that the debtors and creditors had no notice of the retroactive increase in fees. We readily conclude there is no due process violation.[10]

Bankruptcy legislation, like the 2017 Amendment, is subject to the same rational basis review applied to economic and social legislation. *See In re Wood*, 866 F.2d 1367, 1370 (11th Cir. 1989). "This is not a rigorous test and is generally easily met." *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1382 (11th Cir. 2011).

---

[10] Quite tellingly, Bast Amron cites no case holding the substantive component of due process is violated by legislation of which the parties did not have notice or that imposes an allegedly excessive fee. Instead, Bast Amron cites only the two bankruptcy cases reversed and abrogated by the Fifth Circuit in *Buffets* and cases that generally address whether a law was impermissibly retroactive (which the 2017 Amendment is not, *supra* Section II.A). *See* Opening Br. at 26–30; *see also* Reply Br. at 33–34 (citing no authority).

"We must simply determine whether 'any set of facts may be reasonably conceived to justify legislation.'" *Id.* (quoting *TRM, Inc. v. United States*, 52 F.3d 941, 945 (11th Cir. 1995)).[11]

Congress enacted the 2017 Amendment to achieve a legitimate goal—*i.e.*, addressing the shortfall in the budget of the U.S. Trustee System Fund and funding bankruptcy judgeships—in a rational manner, *i.e.*, increasing fees for the largest bankruptcies for a four-year period. *See* H.R. Rep. No. 115-130, at 7–9. The budget-focused purpose is further supported by the provision in the 2017 Amendment that only triggers the higher fees if a certain budget threshold has not yet been met. Pub. L. No. 115-72, sec. 1004(a), § 1930(a)(6), 131 Stat. at 1232 (increasing fees "if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000"). And Congress' decision "to have large debtors shore up the system's finances as their cases typically place greater burdens on the system" was reasonable. *Buffets*, 979 F.3d at 380 (citation omitted). This is enough to satisfy constitutional scrutiny.

Bast Amron's labelling the increased fees as excessive does not change our analysis given the reasonableness of the 2017

_____

[11] The same test would apply had we concluded that the 2017 Amendment had any retroactive effect. *See Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1057 (11th Cir. 2008) ("When a statute has a retroactive effect, the government must also prove that the statute's retroactive application furthers a legitimate legislative purpose.").

Amendment. *See Buffets*, 979 F.3d at 380–81 (noting the 2017 "increase caps the fees at 1% of disbursements, which is a much lower percentage than some small debtors pay," like those with distributions of $15,000, who would be charged $650, the equivalent of a 4.33% fee (footnote omitted)); *cf. Swisher Int'l, Inc.*, 550 F.3d at 1057 (rejecting a due process–based argument that a law "impose[d] retroactive liability that is disproportionate to [the petitioner's] participation in the . . . program" because the law served legitimate legislative purposes and Congress chose rational means). And the lack of notice about the 2017 Amendment to debtors or anyone else does not alter this substantive due process analysis either. *Cf. United States v. Carlton*, 512 U.S. 26, 34, 114 S. Ct. 2018, 2023, 129 L. Ed. 2d 22 (1994) (holding the lack of notice of a new tax law did not establish a due process violation because "a taxpayer 'should be regarded as taking his chances of any increase in the tax burden which might result from carrying out the established policy of taxation'" (quoting *Milliken v. United States*, 283 U.S. 15, 23, 51 S. Ct. 324, 327, 75 L. Ed. 809 (1931))). Therefore, the increased fees charged in this case did not violate the Due Process Clause.

C. *The Tax Uniformity Requirement Is Inapplicable to the 2017 Amendment's Increase in Quarterly Fees, Which Are User Fees*

Congress has the "Power To lay and collect Taxes, Duties, Imposts and Excises . . . ; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8,

cl. 1.   Bast Amron argues that the quarterly fees imposed by § 1930(a)(6) and amended by the 2017 Amendment violate this clause's uniformity requirement.   It agrees, however, that legislation is not subject to the uniformity requirement for taxes if it imposes a "user fee."   We hold that the quarterly fees are merely user fees, not taxes, and thus this constitutional provision did not restrict Congress in its enactment of the 2017 Amendment.

The quarterly fees are user fees because they are assessed against the users of the chapter 11 bankruptcy trustee systems and are "intended to reimburse the United States for its costs in connection." *See United States v. Sperry Corp.*, 493 U.S. 52, 60, 110 S. Ct. 387, 393, 107 L. Ed. 2d 290 (1989).   Bast Amron, echoing its due process argument, urges that the increased quarterly fees paid by debtors are excessive and disproportionate to the services they received from the U.S. Trustee.   But a user fee may "defray the cost of a federal program by recovering a fair approximation of each beneficiary's share of the cost," and the 2017 Amendment's new fee scheme—calibrating the largest debtors' fees at 1% with a cap at $250,000—is a fair approximation.   *See Massachusetts v. United States*, 435 U.S. 444, 460, 98 S. Ct. 1153, 1163–64, 55 L. Ed. 2d 403 (1978); *e.g.*, *Sperry Corp.*, 493 U.S. at 61–64, 110 S. Ct. at 395–96 (holding a 1.5% tribunal user fee was not unconstitutionally excessive as to constitute a taking (citing *Massachusetts*, 435 U.S. at 462, 463, 468, 98 S. Ct. at 1165, 1168)).

We, therefore, hold as our sister circuits that have addressed this particular issue have unanimously held:  the quarterly fees are

user fees on which the Constitution does not impose the uniformity requirement applicable to taxes. *See Buffets*, 979 F.3d at 376 n.7 ("[T]he increased fees are user fees, which means they are not general taxes to which the Uniformity Clause applies." (citation omitted)); *Cir. City Stores*, 996 F.3d at 164 ("Put succinctly, because the Uniformity Clause only applies to taxes, as the U.S. Trustee maintains and as the Fifth Circuit correctly ruled, that Clause is inapplicable here.").

D. *The 2017 Amendment is a Uniform Law On the Subject of Bankruptcies*

Congress has the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. The most involved question in this case is whether the 2017 Amendment violates this clause. Bast Amron argues that the Bankruptcy Uniformity Clause (hereinafter "Bankruptcy Uniformity Clause" or "Bankruptcy Clause" or "Clause") applies to the 2017 Amendment to 28 U.S.C. § 1930(a)(6) because they are laws on the subject of bankruptcies and that the Amendment is substantively nonuniform because it imposed higher fees in only UST districts and not BA districts. Appellee-Cross Appellant also separately appeals part of the bankruptcy court's decision, arguing in the first instance that the Bankruptcy Clause does not apply and, if it does, she argues that the bankruptcy court erred in holding that 2% of the fees collected pursuant to the 2017 Amendment make the law partially nonuniform.

We address these appeals in two main sections. First, we hold that the 2017 Amendment and the quarterly fee provisions it amended are laws on the subject of bankruptcies and thus the uniformity requirement of the Bankruptcy Clause applies. Second, we hold that the 2017 Amendment is uniform and fully complies with the requirements of the Bankruptcy Clause because the flexibility inherent in the Clause cautions us against a strict inquiry that would make dispositive Congress' use of two different statutory vehicles to impose quarterly fees—*i.e.*, § 1930(a)(6) to mandate the fees in UST districts and § 1930(a)(7) to permit them in BA districts—and requires that we consider the historical operation of the two vehicles together to set equal fees in UST and BA districts for nearly two decades. For these reasons, and those explained below, we reject Bast Amron's appeal on the uniformity issue but hold in favor of the Region 21 United States Trustee on her separate appeal challenging the bankruptcy court's holding with respect to the 2% allocation.

As an initial matter, however, we want to be clear that we do not address whether there is a constitutional nonuniformity problem as a result of the mere fact of the existence of the bankruptcy administrator program in the BA districts of Alabama and North Carolina and the U.S. Trustee program in every other district. Bast Amron did not ask our Court or the bankruptcy court to strike down any law based on an argument that the existence of two trustee systems is nonuniform, and thus we will not address this additional constitutional question.

Addressing this additional question would violate the "established practice [to] interpret[] statutes to avoid constitutional difficulties." *Off. of Senator Mark Dayton v. Hanson*, 550 U.S. 511, 514, 127 S. Ct. 2018, 2021, 167 L. Ed. 2d 898 (2007). Indeed, "the judicial preference for avoiding constitutional questions when possible" is strong in this case because there are immense implications of venturing into a complex inquiry that could lead to the nullifying of an important feature of bankruptcies across the country that has existed for decades. *See Harbourside Place, LLC v. Town of Jupiter, Fla.*, 958 F.3d 1308, 1315 (11th Cir. 2020) (citing *Camreta v. Greene*, 563 U.S. 692, 705, 131 S. Ct. 2020 (2011)). Moreover, the parties did not brief the issue of the constitutionality of the two systems,[12] and

---

[12] Bast Amron's last-second attempt in a footnote in its reply brief (and in its Rule 28(j) correspondence) to recast the history of briefing in this case is woefully inadequate to raise the broader question of the constitutionality of the two trustee systems. Bast Amron states in its reply brief that it "repeatedly challenged the divergence between the two systems as unconstitutionally non-uniform," and cites briefing before the bankruptcy court and the opening brief before this Court. *See* Reply Br. at 27 n.12. We have carefully examined each citation to which Bast Amron refers, both in its briefs on appeal and in its briefs to the bankruptcy court. However, those citations are to portions of its briefs that either argue about the constitutionality of the 2017 Amendment or make a conclusory assertion that there is no justification in the form of geographically isolated problems. At most, Bast Amron has merely referenced the existence of the two systems, and merely assumed the unconstitutionality thereof without providing any argument showing why or how the mere existence of the two systems is unconstitutional. For example, it has identified no nonuniformity other than the fee structure, and makes no argument that the mere existence of the dual systems somehow creates nonuniformities that

we generally do not address questions not briefed. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) ("Under our caselaw, a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. Otherwise, the issue—even if properly preserved at trial—will be considered abandoned."). We decline to create an additional constitutional difficulty on our own without the required briefing from any party.[13] *See Buffets*, 979 F.3d at 379 ("Our normal reluctance to hold unconstitutional a decades-old feature of federal bankruptcy law should grow into a

violate the flexible uniformity requirement. The focus of Bast Amron's briefing is clear: it challenges only the 2017 Amendment and disparate fee structure—not the mere existence of the dual systems. *See Brown v. United States*, 720 F.3d 1316, 1332 (11th Cir. 2013) ("Merely making passing references to a claim under different topical headings is insufficient."). Like in *Buffets*, "[n]either side addresses the decision more than three decades ago to create two separate systems," "[n]or was the original 1986 law addressed in the bankruptcy court decision in this case." 979 F.3d at 379 n.14. We readily conclude that Bast Amron has failed to fairly raise a constitutional challenge to the mere existence of the dual systems, either in the bankruptcy court or in this Court. Thus, we address only the particular issues outlined above.

[13] Thus, like the majorities in *Buffets* and *Circuit City Stores*, we decline to address the issue that was pivotal for their partially dissenting colleagues. *Buffets*, 979 F.3d at 384–85 (Clement, J., concurring in part and dissenting in part) ("Two laws are not a uniform law, so I would hold that the permanent division of the country into UST districts and BA districts violates the Bankruptcy Clause and would order Buffets to pay the lower fee."); *Cir. City Stores*, 996 F.3d at 175 (Quattlebaum, J., concurring in part and dissenting in part) ("Accordingly, while the constitutionality of the two types of bankruptcy systems is not before the court, I would nonetheless hold that the amended quarterly fee statute, as applied . . . , violates the Bankruptcy Clause.").

20-12547                Opinion of the Court                31

refusal when no party is asking us to do so." (footnote omitted)). This is especially true in light of the enormous consequences of any decision that the existence of the two systems is unconstitutional, and the enormous complexity of the issue. With respect to the latter, the necessary inquiry would include an intensive analysis of the history of the origin of the two systems, the congressional rationale therefor, an extensive and complicated analysis of the operation of each system, and a comparison thereof to determine whether there is a resulting nonuniformity in violation of the flexible Bankruptcy Uniformity Clause.

Therefore, we proceed to answer only the questions raised, starting with whether the 2017 Amendment is a law on which the Bankruptcy Clause imposes a uniformity requirement.

     1.  The 2017 Amendment is a "Law[] on the subject of Bankruptcies."

The Bankruptcy Clause of the Constitution grants Congress the authority to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. The Supreme Court has stated "[t]he subject of bankruptcies is incapable of final definition." *Ry. Lab. Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466, 102 S. Ct. 1169, 1175, 71 L. Ed. 2d 335 (1982) (alteration in original) (quoting *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513–14, 58 S. Ct. 1025, 1031–32, 82 L. Ed. 1490 (1938)). The inability to finally define the subject of bankruptcies is one indicator of the Clause's broad scope, which empowers Congress to enact a wide range of laws that come within the subject. *See*

*Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 187, 22 S. Ct. 857, 860, 46 L. Ed. 1113 (1902) ("The framers of the Constitution were familiar with Blackstone's Commentaries, and with the bankrupt laws of England, yet they granted plenary power to Congress over the whole subject of 'bankruptcies,' and did not limit it by the language used."); *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 370, 126 S. Ct. 990, 1000, 163 L. Ed. 2d 945 (2006) (explaining that "[t]he Framers would have understood that laws 'on the subject of Bankruptcies' included laws providing, in certain limited respects, for more than simple adjudications of rights in the res," including courts' "historical[] . . . power to issue ancillary orders").

Legislation is within the Bankruptcy Clause's reach if it touches on "the 'subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief.'" *Gibbons*, 455 U.S. at 466, 102 S. Ct. at 1175 (quoting *Wright*, 304 U.S. at 513–14, 58 S. Ct. at 1031–32). Section 1930(a)(6), which the 2017 Amendment altered, affects the relations between debtors and creditors, limiting the amount of funds made available to satisfy debts and afford relief. The 2017 Amendment itself does the same by further limiting funds for some debtors and creditors. Therefore, the 2017 Amendment is a law on the subject of bankruptcies to which the uniformity requirement applies.

Region 21 United States Trustee attempts to make a distinction based on "administrative" or "auxiliary" laws, arguing that statutes authorizing bankruptcy appellate panels, local rules, and

20-12547          Opinion of the Court          33

the quarterly fees are not subject to the Bankruptcy Clause. We, like every other court to have addressed similar arguments from the government, reject this contention. *See In re Clinton Nurseries, Inc.*, 998 F.3d 56, 64 & n.6 (2d Cir. 2021) ("The Trustee's argument has been repeatedly rejected by other courts.") (collecting cases); *Buffets*, 979 F.3d at 377 (observing that "every bankruptcy court dealing with a challenge to the 2017 Amendment has rejected the analogy" "to the different local bankruptcy rules that districts apply or the Bankruptcy Appellate Panels that only some circuits use"). That is, while the validity of laws other than the 2017 Amendment to which Appellee analogizes are not before us, the "administrative" nature of the 2017 Amendment and § 1930(a)(6) does not except them from the reach of the Bankruptcy Clause. The 2017 Amendment "has a direct effect on what creditors receive—less than before," *Buffets*, 979 F.3d at 377, and thus comes within the Bankruptcy Clause's broad definition of "Laws on the subject of Bankruptcies." *See Gibbons*, 455 U.S. at 466, 102 S. Ct. at 1175. Therefore, we must determine whether the 2017 Amendment is uniform under the Clause.[14]

---

[14] Because we conclude that the Bankruptcy Clause applies and, as explained below, hold that the law is uniform, we need not reach Appellee's extended argument regarding the Necessary and Proper Clause as a source of congressional power to which a uniformity requirement does not apply.

2.  The 2017 Amendment is uniform in the sense contemplated by the Bankruptcy Clause.

Broad is the subject of bankruptcies, and "inherent[ly]" "flexib[le]" is the uniformity requirement that goes with it. *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 158, 95 S. Ct. 335, 366, 42 L. Ed. 2d 320 (1974).  In the simplest terms, all "[t]he uniformity clause requires" is that congressional enactments "apply equally to all creditors and all debtors." *Id.* at 160, 95 S. Ct. at 367.  Otherwise, the Supreme Court has described the uniformity requirement as "not [being] a straightjacket" for congressional action. *Gibbons*, 455 U.S. at 469, 102 S. Ct. at 1176.  Indeed, since the country's founding, "the tendency of legislation and of judicial interpretation has been uniformly in the direction of progressive liberalization in respect of the operation of the bankruptcy power." *Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi., R.I. & P. Ry. Co.*, 294 U.S. 648, 668, 55 S. Ct. 595, 603, 79 L. Ed. 1110 (1935).  Thus, strict and "formalistic approaches to uniformity in bankruptcy . . . 'overlook[] the flexibility inherent in the constitutional provision.'" *In re Schafer*, 689 F.3d 601, 609 (6th Cir. 2012) (quoting *Schultz v. United States*, 529 F.3d 343, 354 (6th Cir. 2008) (quoting *Blanchette*, 419 U.S. at 158, 95 S. Ct. at 366)).  That is, although the Supreme "Court has recognized that 'the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress' power,' . . . a strict reading of this statement 'overlooks the flexibility inherent in the constitutional provision,' and improperly cabins the reach of Congress'[] authority." *Schultz*, 529 F.3d at 354

(citation omitted) (first quoting *Gibbons*, 455 U.S. at 468, 102 S. Ct. 1169; then quoting *Blanchette*, 419 U.S. at 158, 95 S. Ct. at 366). "The Supreme Court has made clear that perfect uniformity is not required." *In re Reese*, 91 F.3d 37, 39 (7th Cir. 1996) (Posner, C.J.) (citing *Gibbons*, 455 U.S. at 469, 102 S. Ct. at 1176).

The extent of the uniformity requirement's flexibility is apparent from the fact that the Supreme Court has only once held that a law was unconstitutionally nonuniform and has spoken of only one other possible kind of violation. *See In re McFarland*, 790 F.3d 1182, 1194 (11th Cir. 2015) ("*Gibbons*, after all, was the first (ever!) opinion *enforcing* bankruptcy uniformity against Congress, yet the Supreme Court still deployed the 'not a straightjacket' language . . . ."). That is, in *Railway Labor Executives' Ass'n v. Gibbons*, the Court held that employee protection provisions of a statute only applicable to Rock Island and Pacific Railroad Co. were unconstitutional because they "applie[d] to only one regional bankrupt railroad, and [could not] be said to apply uniformly even to major railroads in bankruptcy proceedings throughout the United States." 455 U.S. at 471, 102 S. Ct. at 1177–78. The uniformity requirement is thus understood to prohibit private bankruptcy bills, as *Gibbons* makes clear, as well as restrictions based on regionalism that do not address a geographically isolated problem, as the Supreme Court has stated in other discussions. *See Blanchette*, 419 U.S. at 159, 95 S. Ct. at 366; *Buffets*, 979 F.3d at 378 ("Aside from prohibiting such 'private bankruptcy bills,' which does not describe the fee increase, the uniformity requirement forbids only

'arbitrary regional differences in the provisions of the Bankruptcy Code.'" (quoting *Reese*, 91 F.3d at 39)).

These two limited circumstances under which legislation may be a Bankruptcy Clause violation are consistent with the Framers' intent in providing for the Clause in the interest of a functioning national economy. Though the Framers' intent in including the uniformity requirement is notoriously limited compared to other constitutional provisions, we know that their "primary goal was to prevent competing sovereigns' interference with the debtor's discharge," and they "plainly intended to give Congress the power to redress the rampant injustice resulting from States' refusal to respect one another's discharge orders." *Katz*, 546 U.S. at 373, 377, 126 S. Ct. at 1002, 1004. "As James Madison observed, '[t]he power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.'" *Gibbons*, 455 U.S. at 465–66, 102 S. Ct. at 1175 (alteration in original) (quoting The Federalist No. 42, at 285 (N.Y. Heritage Press 1945)). With this broad concern about state interference with the interactions of creditors and debtors across a national economy, "[t]o survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors." *Id.* at 473, 102 S. Ct. at 1178.

Bast Amron argues that this requirement has not been met because an unjustifiable disparity was created by the 2017

Amendment and § 1930(a)'s separate treatment of UST and BA districts—*i.e.*, making the fee increase mandatory in UST districts but permissive in BA districts, with respect to which the Judicial Conference delayed actual implementation of the increase. "[T]he flexibility inherent in the constitutional provision," *Blanchette*, 419 U.S. at 158, 95 S. Ct. at 366, as we explain below, leads us to conclude that the uniformity requirement was satisfied in this case because the 2017 Amendment contemplated increased fees for the class of debtors distributing $1 million or more in a quarter regardless of the location of the bankruptcy proceedings.[15]

The 2017 Amendment does not, as Bast Amron argues, discriminate based on UST or BA districts. Its terms state nothing about UST districts or BA districts. Of course, the statute that the 2017 Amendment amended provided for two different vehicles for the imposition of fees in UST districts and BA districts. That is, 28 U.S.C. § 1930(a)(6)(A), as amended in 2017, provided that "a quarterly fee shall be paid to the United States trustee" in UST districts, while § 1930(a)(7) provided with respect to BA districts, that the Judicial Conference "may require the debtor . . . to pay fees equal to those imposed by paragraph (6)." 28 U.S.C. § 1930(a)(6)(A), (7).

---

[15] Because we conclude that the class of debtors is not limited to UST districts, and we conclude that that class was treated uniformly regardless of location, we avoid the issue that the Second Circuit in *Clinton Nurseries* perceived with the decisions of the Fourth and Fifth Circuits, which conceptualized the class of debtors as solely within UST districts. 998 F.3d at 69 & n.15.

But the flexibility of the Bankruptcy Clause permits Congress to choose how to provide for the implementation of a uniform law. That is, the decisions to use two different statutory provisions to establish quarterly fees for every district in the country comes well within the flexible range of permissible bankruptcy legislation. As we demonstrate below, we conclude that our inquiry cannot turn merely on the difference between the words "shall" and "may"; a flexible inquiry cannot be so rigid and particular about the mechanics of the legislative text. Indeed, we think Congress' increase in quarterly fees in all districts in the country by way of two statutory provisions does not implicate the concerns of the Framers in deciding to enact the uniformity requirement.

More consistent with the Supreme Court's counsel that the Bankruptcy Clause is not a straightjacket, and in light of the Framers' concern with interests not implicated at all in this case, we examine several important legal developments and the legislative record, which indicate that Congress understood that by amending § 1930(a)(6), it was also increasing fees chargeable by way of § 1930(a)(7), which contemplates "fees equal to those imposed by paragraph (6)." In particular, the Judicial Conference indicated its understanding was the same as Congress', relaying to Congress that the Conference would maintain its role in the implementation of uniform quarterly fees whenever those fees would increase. That is, we conclude that the uniformity requirement does not require that Congress increase fees by mandating them in all districts in the country.

20-12547            Opinion of the Court            39

    We first explore the basis for this understanding and the history of the two different vehicles for implementation of quarterly fees that in fact historically operated together to set equal quarterly fees everywhere. Then, we discuss how the legislative history of the 2017 Amendment indicates Congress operated under the assumptions supported by the prior history. Finally, we explain why the 2017 Amendment was uniform, despite the Judicial Conference's departure from the historical norm.

    a. *The history of 28 U.S.C. § 1930(a) and quarterly fees indicates equal fees were charged throughout the United States from 2001 to 2017.*

    Before 2000, quarterly fees were not collected in Alabama and North Carolina's districts because they had not joined the U.S. Trustee program; that is, quarterly fees were authorized to be collected only in UST districts, where the U.S. Trustee operated, leaving BA districts (*i.e.*, Alabama and North Carolina's districts) without quarterly fees. The intention was originally to have all states' districts join the program, but Alabama and North Carolina's districts were given extensions of time to become UST districts, the result being that those states' districts did not have the quarterly fees like the rest of the country for some time.[16]

_____

[16] *See* Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, sec. 302(d)(3), 100 Stat. 3088, 3121–22 (setting deadline as October 1, 1992); Judicial Improvements Act of 1990, Pub.

40                    Opinion of the Court                    20-12547

In a challenge based on the quarterly fee disparity resulting from the second extension of time for Alabama and North Carolina's districts, the Ninth Circuit in *St. Angelo v. Victoria Farms, Inc.* held that the extension provision—*i.e.,* the provision that allowed Alabama and North Carolina's districts to remain as BA districts without quarterly fees being collected—was unconstitutionally nonuniform. 38 F.3d 1525, 1531–33 (9th Cir. 1994), *amended*, 46 F.3d 969 (9th Cir. 1995). Congress gave no reason for the extended deadline, such as whether it was addressing a geographically isolated problem, and the effect of the law left "the relationship between creditor and debtor in states other than North Carolina and Alabama [as] governed by a different, more costly system." *Id.* at 1532. To remedy the nonuniformity, the Ninth Circuit struck down the provision providing for the extension "rather than 28 U.S.C. § 1930 in its entirety, . . . leav[ing] in place a uniform law governing bankruptcy throughout the nation." *Id.* at 1533.

Legislation was proposed and enacted to address *St. Angelo*; the issue identified by the Ninth Circuit continued because Alabama and North Carolina's districts never joined the U.S. Trustee program. Thus, a couple years after the Ninth Circuit's decision, the Judicial Conference issued a report regarding § 1930 that acknowledged that "chapter 11 debtors in bankruptcy administrator districts [we]re not subject to an additional quarterly fee that is

L. No. 101-650, sec. 317(a)(1), 104 Stat. 5089, 5115 (setting deadline as October 1, 2002).

levied on chapter 11 debtors in the United States trustee districts." Judicial Conference of the U.S., Report of the Proceedings of the Judicial Conference of the United States 10 (Mar. 1996). "On recommendation of the Bankruptcy Committee, the Conference agreed to take appropriate action to institute quarterly chapter 11 fees in bankruptcy administrator districts comparable to those in effect in United States trustee districts so that the revenues go to the judiciary." *Id.* The Bankruptcy Committee recommendation explained the basis for the quarterly fee proposal: "the implementation of the quarterly fees in bankruptcy administrator districts would *eliminate* any [*St. Angelo v.* ]*Victoria Farms* problem and, if it is provided that the judiciary could retain the fees, the judiciary would obtain much-needed revenues that could, among other things, be used to offset the costs of operating the bankruptcy administrator program." Judicial Conference of the U.S., Report of the Committee on the Administration of the Bankruptcy System 4–6 (Mar. 1996) (emphasis added); *see also id.* at 4 ("Currently, debtors in the United States trustee and bankruptcy administrator districts pay the same fees when filing for bankruptcy, but chapter 11 debtors in bankruptcy administrator districts are not subject to the additional quarterly fee that is levied on chapter 11 debtors in United States trustee districts.").

In 1999, in a prepared statement submitted to Congress on behalf of the Judicial Conference, the Honorable Harvey F. Schlesinger, United States District Judge for the Middle District of Florida, explicitly addressed how the proposed legislation discussed in

the Conference's 1996 records would address the constitutional uniformity concerns raised in *St. Angelo*. He explained that "the proposed language"—that was ultimately enacted into law (*i.e.*, "the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed" by § 1930(a)(6)—"*authorizes* the Judicial Conference to implement fees in the bankruptcy administrator program in the judicial districts in the states of Alabama and North Carolina similar to those currently imposed by 28 U.S.C. § 1930(a)(6)." *Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and Federal Courts Improvement Act of 1999: Hearing on H.R. 2112 & H.R. 1752 Before the Subcomm. on Cts. & Intell. Prop. of the H. Comm. on the Judiciary*, 106th Cong. 27 (1999) (statement of Hon. Harvey F. Schlesinger, J., U.S. Dist. Ct. M.D. Fla.) (emphasis added). Continuing his explanation to Congress, Judge Schlesinger stated:

> At its March 1996 proceeding, the Judicial Conference determined that implementing the establishment of chapter 11 quarterly fees in the bankruptcy administrator districts would eliminate any [*St. Angelo v.*] *Victoria Farms* problem and by providing that the judiciary could retain the fees much-needed revenues could be used to offset the cost of operating the bankruptcy administrator program. If a quarterly fee were implemented in the bankruptcy administrator districts through which the judiciary could retain the fees, any surplus exceeding the costs of the

> bankruptcy administrator program would be dedi-
> cated to the judiciary to offset costs of the judicial sys-
> tem.

*Id.* at 26–27; *see also* Judicial Conference of the U.S., Report of the Committee on the Administration of the Bankruptcy System 6 (Mar. 1999) ("The Bankruptcy Committee reaffirmed its support for the following . . . legislative proposals on the basis that their enactment would provide enhancements to the bankruptcy system and the efficient administration of justice: . . . amend 28 U.S.C. § 1930(a) to extend the quarterly fee in chapter 11 cases to districts served by bankruptcy administrators . . . ."). Thus, the Judicial Conference understood, and conveyed to Congress this understanding, that the permissive language that would authorize (but not require) the Judicial Conference to impose quarterly fees would satisfy the demands of constitutional bankruptcy uniformity, the rational inference being that the Judicial Conference was also conveying to Congress the intention of the Conference to impose the same fees in the BA districts such that the fees would be uniform.

Congress acted to address these concerns when it added to § 1930(a) paragraph (7), which provided—just as the proposed language did that the Judicial Conference explained would satisfy the uniformity issue with quarterly fees—"the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6)" in BA districts (the "2000 Amendment"). Federal Courts

Improvement Act of 2000, Pub. L. No. 106-518, sec. 105, § 1930(a), 114 Stat. 2410, 2412.[17] Thus, "Congress fixed th[e] problem" identified in *St. Angelo* "with a law empowering the Judicial Conference to set fees in [BA] districts that were 'equal to those imposed' in [UST] districts." *Buffets*, 979 F.3d at 371. While the statute did not mandate that the Judicial Conference exercise that power, it stated the Judicial Conference may set fees "equal to those imposed" by the U.S. Trustee—*i.e.*, giving the Judicial Conference the power to collect quarterly fees in the remaining districts.[18] However, the clear inference is that Congress—having enacted the legislation that was proposed by the Judicial Conference and explained by the Conference as satisfying the Bankruptcy Uniformity Clause—contemplated that the Judicial Conference would act to equalize the fee requirement.

The Judicial Conference did in fact exercise its power pursuant to § 1930(a)(7) in 2001. Judicial Conference of the U.S., Report of the Proceedings of the Judicial Conference of the United States 45–46 (Sept./Oct. 2001) (hereinafter 2001 Judicial Conference

---

[17] This 2000 Amendment also made permanent the operation of the BA system in Alabama and North Carolina districts. *See Buffets*, 979 F.3d at 370 n.1.

[18] Bast Amron implies that § 1930(a)(7), by referencing § 1930(a)(6), does not set the fee schedule for BA districts but rather sets the maximum. We disagree with that reading. Instead, in 2000, Congress plainly granted the Judicial Conference the power to charge "fees *equal to those* imposed by paragraph (6)," not any other power.

20-12547                Opinion of the Court                45

Report).    In doing so, the Conference explained that the 2000 Amendment "authorize[d] the Conference to impose quarterly fees in chapter 11 cases in bankruptcy administrator districts comparable to those already being charged in United States trustee districts."  *Id.* at 46.  "To implement this statute, the Conference approved a Bankruptcy Committee recommendation . . . ."  *Id.*  The Committee had stated, "Until recently, only United States trustees, and not bankruptcy administrators, had statutory authority to collect quarterly fees in chapter 11 cases," but *St. Angelo* identified the constitutional issue and the Conference proposed legislation that was ultimately signed into law.  Judicial Conference of the U.S., Report of the Committee on the Administration of the Bankruptcy System 9–10 (Sept. 2001).  Thus, the Judicial Conference acknowledged what it had conveyed to Congress prior to the enactment of the 2000 Amendment:  the 2000 Amendment satisfied the Bankruptcy Clause's uniformity requirement because quarterly fees could be—and now, in fact, would be—collected in all districts.

The Conference's method of implementing the statutory quarterly fee collection power was to approve the recommendation "that such fees be imposed in bankruptcy administrator districts in the amounts specified in 28 U.S.C. § 1930, *as those amounts may be amended from time to time.*"  2001 Judicial Conference Report at 46 (emphasis added); *see* Judicial Conference of the U.S., Report of the Committee on the Administration of the Bankruptcy System 10 (Sept. 2001) (recommending "[t]hat the Judicial Conference impose quarterly fees on chapter 11 cases filed in bankruptcy

administrator districts in the amounts specified in 28 U.S.C. § 1930, *as those amounts may be amended from time to time*" after explaining history of quarterly fee disparity (emphasis added)). There is an indication, in voting to approve the Committee recommendation, "that the Judicial Conference may have intended for its one-time vote to encompass all future fee increases." *See Cranberry Growers Coop. v. Layng*, 930 F.3d 844, 856 n.51 (7th Cir. 2019).

We conclude the legislative history of the 2000 Amendment indicates that Congress understood that § 1930(a)(7) would operate in tandem with § 1930(a)(6) and its fee schedule—that is, that as of 2001, equal fees were to be imposed in all districts in the country, with a likely understanding that any "amend[ments]" to "those amounts" in § 1930(a)(6) "from time to time" would automatically be the quarterly fee amounts imposed in BA districts.

With this foundation, Congress enacted the 2007 Amendment by simply amending the schedule in § 1930(a)(6) and stating the new fees would be effective January 1, 2008. Pub. L. No. 110-161, sec. 213(a), § 1930(a)(6), 121 Stat. at 1914. Indeed, the legislative history of this 2007 Amendment supports the conclusion that there was a continued understanding of Congress and the Judicial Conference that § 1930(a)(6) and (a)(7) operated together to set equal fees in every district. In March 2007, Congress asked the Judicial Conference about a decline in bankruptcy filings, leading to reduced fee revenues, and what proposals "the case trustees and U.S. Trustees [had] to generate additional fee revenue." *Financial Services and General Government Appropriations for Fiscal Year*

20-12547               Opinion of the Court                    47

*2008: Hearing on H.R. 2829 Before the Subcomm. of the S. Comm. On Appropriations*, 110th Cong. 103 (2007) (Additional Committee Questions).[19]   The Judicial Conference responded by explaining a proposal of the Department of Justice, of which the U.S. Trustee's office is a part, to increase quarterly fees set by 28 U.S.C. § 1930(a). *Id.* at 103–04.   The Judicial Conference stated explicitly,

> This proposal would affect the Judiciary in that *parallel* Chapter 11 quarterly fees are also collected in the six bankruptcy administrator districts in Alabama and North Carolina. *The Judiciary would most likely increase quarterly fees in those districts, parallel to the increases proposed by the Department of Justice to the U.S. trustee quarterly Chapter 11 fee increases, to maintain national parity* between the two programs. Such fees are deposited as offsetting receipts to the fund established under section 1931 of title 28, United States Code.   Aside from a *parallel increase in the Chapter 11 quarterly fee in the bankruptcy administrator districts*, this proposal would not affect the Judiciary.

---

[19] The Honorable Julia S. Gibbons, Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, as Chair of the Budget Committee of the Judicial Conference, and James C. Duff, Director of the Administrative Office of the Courts, had testified before the U.S. Senate Subcommittee of the Committee of Appropriations on March 21, 2007, and the question described above was "submitted to the judiciary for response subsequent to the hearing."   110th Cong. 1, 96.

*Id.* at 104 (emphasis added).  Congress indicated no different understanding when it enacted the 2007 Amendment pursuant to the Judicial Conference's implicit adoption of the DOJ proposal, which simply rewrote the fee schedule in § 1930(a)(6) with higher fees, effective January 1, 2008.  *See* U.S. Dep't of Justice, U.S. Trustee Program Fiscal Year 2008 Budget Request 9 (2007) (proposing the exact fee schedule adopted by Congress in the 2007 Amendment); *supra* note 1.  In other words, in 2007, Congress simply increased the fees set out in § 1930(a)(6) pursuant to the understanding as presented by the Judicial Conference that the fees would remain "parallel," to "maintain national parity," and thus continue to be uniform across all bankruptcy districts.  And the Judicial Conference indicated no different understanding once the 2007 Amendment was enacted.  In its March 2008 report, the Bankruptcy Committee of the Judicial Conference noted that it had "received reports on recent legislation increasing the chapter 11 quarterly fees collected by the United States trustee program," and stated nothing more.  Judicial Conference of the U.S., Report of the Committee on the Administration of the Bankruptcy System 8 (Mar. 2008).  This silence at least suggests that the Committee—having worked for several years on quarterly fee legislation for BA districts—saw no uniformity issue with the 2007 Amendment, which makes sense in light of the prior Judicial Conference decision that the fees in BA districts would reflect the § 1930(a)(6) fees as "amended from time to time."

Bast Amron does not dispute that the fees in the 2007 Amendment applied to BA districts automatically.[20]  Indeed, the parties have not presented, nor has our research discovered, any case law regarding the application of the 2007 Amendment's fee increase in BA districts.  We reasonably conclude from this silence and the lack of controversy that there was no controversy in the BA districts over having the new 2007 Amendment fees applied automatically, just like in UST districts.  For the purposes of determining what Congress could assume when it increased fees again in 2017, *i.e.*, the increase at issue in this case, we think this void in the case law around 2007 is telling—neither Congress nor anyone else had reason to believe that amending § 1930(a)(6) again in 2017 would not operate as it did in 2007 to increase fees uniformly in all bankruptcy districts.

And while the case law is absent, archived court websites and contemporary dockets provide some confirmation of what Congress' and the Judicial Conference's silence suggests—that the increased fees from the 2007 Amendments were collected in BA districts consistent with the legislation's effective date.  Websites from each of the BA districts provided notice that the new fees

---

[20] Again—as stated with regards to its arguments discussed in Section II.A— Bast Amron only points to the 2007 Amendment's modest increase in fees compared to the 2017 Amendment.

50                     Opinion of the Court                     20-12547

were chargeable as of January 1, 2008, in each BA district.[21]  In addition, our review of quarterly fee statements and similar filings in BA districts for the first quarter of 2008 generally show the new fees were paid.[22]  We think this provides a reasonable basis, in light of

---

[21] *See U.S. Bankr. Adm'r, N.D. Ala.*, https://web.archive.org/web/20080205071347/https://www.alnba.uscourts.gov/ (archived Feb. 5, 2008) ("Effective January 1, 2008, the quarterly fee schedule was amended. . . . Fees under the new schedule are first due from chapter 11 debtors to the United States Bankruptcy Court by the end of April 2008."); *U.S. Bankr. Ct., W.D.N.C.*, https://web.archive.org/web/20080214061719/http://www.ncwb.uscourts.gov/ (archived Feb. 14, 2008) ("Effective January 1, 2008 - Statutory Increase In Chapter 11 Quarterly Fees."); *U.S. Bankr. Adm'r, M.D. Ala.*, https://web.archive.org/web/20090223180056/http://www.almba. uscourts.gov/banews.htm (archived Sept. 23, 2008) ("The Judicial Conference of the United States has authorized an increase in the assessment of quarterly fees in all chapter 11 cases.  The increased fees became effective for the quarter beginning January 1, 2008."); *U.S. Bankr. Adm'r, S.D. Ala., Q. Fee Schedule*, https://web.archive.org/web/20100527092125/http://www.alsba. uscourts.gov/Documents/IncreaseFees.pdf (archived Feb. 10, 2008) (listing chapter 11 quarterly fee schedule "Effective 1/1/08"); *U.S. Bankr. Ct., M.D.N.C.*, https://web.archive.org/web/20080923052231/http://www.ncmb.uscourts.gov/ (archived Sept. 23, 2008) ("Chapter 11 Quarterly Fees Increase Effective January 1, 2008 (click for more information)"); *U.S. Bankr. Adm'r, E.D.N.C.*, https://web.archive.org/web/20080516044103/https://www.nceba.uscourts.gov/ (archived May 16, 2008) (stating "*New: Chapter 11 Quarterly Fee Schedule Effective January 1, 2008*" and linking reader to a chart that compares old and new fees and the dollar amount increase).

[22] *See, e.g.*, Quarterly Fee Statement at 1, *In re S. Media Commc'ns, Inc.*, No. 08-BK-10238 (Bankr. S.D. Ala. Apr. 18, 2008), ECF No. 33 (reporting no

20-12547            Opinion of the Court            51

the absence of case law, that the 2007 Amendment increased fees for all districts in the country, BA and UST alike, without any new congressional action other than the 2007 Amendment increasing the § 1930(a)(6) quarterly fees.

Thereafter, but before the 2017 Amendment was considered, no different interpretation was adopted by Congress or the Judicial Conference.[23]

---

disbursements and a fee of $325 for quarter ending March 31, 2008); Quarterly Fee Statement at 1, *In re Beyl*, No. 08-BK-80255 (Bankr. N.D. Ala. Apr. 21, 2008), ECF No. 93 (reporting $54,685.48 in disbursements and a fee of $650 for quarter ending March 31, 2008); Quarterly Fee Statement at 1, *In re Air Dev., LLC*, No. 08-BK-10001 (Bankr. M.D. Ala. Apr. 29, 2008), ECF No. 29 (reporting $9,200 in disbursements and a fee of $325 for quarter ending March 31, 2008); Monthly Report for the Month of March 2008 at 18, *In re Snead*, No. 08-BK-00070 (Bankr. E.D.N.C. June 3, 2008), ECF No. 99 (reporting $27,541.59 in disbursement and a fee of $650 for the quarter ending March 31, 2008); Chapter 11 Quarterly Fee Statement at 1, *In re Ameritrans, LLC*, No. 08-BK-80200 (Bankr. M.D.N.C. July 8, 2008), ECF No. 70 (reporting $114,483.87 in disbursements and a fee of $975 for quarter ending March 31, 2008). *Compare* Chapter 11 Quarterly Fee Statement at 1, *In re Okwara Props., LLC*, No. 07-BK-32376 (Bankr. W.D.N.C. May 29, 2008), ECF No. 56 (reporting $900.72 in disbursements and $250 in fees for quarter ending March 31, 2008, coinciding with pre-2007 fee schedule), *with* Chapter 11 Quarterly Fee Statement at 1, *Okwara*, No. 07-BK-32376 (Bankr. W.D.N.C. Sept. 19, 2008), ECF No. 90 (indicating $303,040.69 in disbursements and $4,875 in fees for calendar quarter ending June 30, 2008, coinciding with new fee schedule).

[23] There were other indications that any uniformity problem with regard to § 1930(a)(6) and (7) and the collection of quarterly fees had long been resolved. In 2009, the Bankruptcy Committee recommended to the Judicial Conference that, in light of the *St. Angelo* opinion, additional changes should be made in

52                    Opinion of the Court                    20-12547

We pause to summarize the history of quarterly fee legisla-
tion and collection before 2017.  The Ninth Circuit issued an im-
pactful decision in *St. Angelo*, identifying a constitutional, Bank-
ruptcy Clause uniformity problem with a disparity that existed

---

BA districts, including the enactment of legislation to grant "the same powers
and duties for bankruptcy administrators that are granted to United States
trustees."  Judicial Conference of the U.S., Report of the Committee on the
Administration of the Bankruptcy System 3–4 (Mar. 2009).  In doing so, the
Committee expressed an understanding that quarterly fees caused no further
issue, stating:

> The Committee observed that the Ninth Circuit Court of Ap-
> peals, in *St. Angelo* . . . determined that the existence of two
> estate administration oversight programs caused a Uniformity
> Clause violation.  *Even though both programs now collect fees
> from debtors in chapter 11 cases*, the Committee believes that
> the judiciary should pursue the same powers and duties for
> bankruptcy administrators that are granted to United States
> trustees . . . .

*Id.* at 3 (emphasis added).  And in 2010, in considering amendments to bank-
ruptcy laws for small business, Congress heard testimony that mentioned the
joint structure in which UST and BA districts both charged quarterly fees by
way of § 1930(a) without controversy.  *See Could Bankruptcy Reform Help
Preserve Small Business Jobs?: Hearing Before Subcomm. on Admin. Over-
sight & Cts. of S. Comm. on the Judiciary*, 111th Cong. 78–79 (2010) (supple-
mental testimony of Hon. Thomas B. Bennet, U.S. Bankr. J., U.S. Bankr. Ct.
N.D. Ala.) (describing how reforms "would cause a loss of revenues . . . for the
funding mechanism for the two groups given significant responsibilities under
the Bankruptcy Code: the United States Trustee Program (U.S. Trustee) and
the Bankruptcy Administrator Program (Bankruptcy Administrator) . . . due
to funding of each by quarterly fees imposed in Chapter 11 cases," and explain-
ing the fee schedule, while citing § 1930(a)(6)–(7)).

because quarterly fees were charged in UST districts but no such fees were charged in BA districts.  The Judicial Conference considered this uniformity problem and recommended that the Conference be granted the power to charge quarterly fees in the six BA districts.  Congress granted that exact power in the way the Judicial Conference proposed—with merely permissive language in the statutory text authorizing the Conference to charge fees—and all concluded this satisfied the post-*St. Angelo*, lingering uniformity issue with quarterly fees, obviously contemplating that the fees would be equal everywhere.  Then, the mechanism enacted into law by way of § 1930(a)(7) proved that such expectation was warranted when the Judicial Conference exercised its power to start collecting fees "in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time" in 2001, and Congress raised fees in 2007 by merely amending the fee schedule in § 1930(a)(6), thus setting fees for UST and BA districts alike.  This was the historical foundation for congressional action in 2017.

> b. *The 2017 Amendment's legislative history indicates no different understanding than that supported by the history of prior amendments to 28 U.S.C. § 1930(a).*

The congressional, Judicial Conference, and U.S. Trustee program documents related to the 2017 Amendment indicate that the fee increase was enacted to satisfy the requests of both the Judicial Conference and the U.S. Trustee related to, primarily, funding bankruptcy judgeships in both UST and BA districts and bolstering the funding of (and replenishing the shortfall in) the U.S.

Trustee program.  In March 2017, the Bankruptcy Committee of the Judicial Conference recommended that Congress authorize four additional bankruptcy judgeships (all in UST districts) and convert 14 temporary judgeships (one in a BA district and the rest in UST districts) to permanent status. Judicial Conference of the U.S., Report of the Committee on the Administration of the Bankruptcy System 5, 13 (Mar. 2017).  In April 2017, the Conference transmitted to Congress these recommendations with draft legislation.  Judicial Conference of the U.S., Report of the Committee on the Administration of the Bankruptcy System 3 (Sept. 2017).  "On May 17, 2017, a bill embodying this recommendation and providing for the adjustment of quarterly fees paid on disbursements made in chapter 11 cases to fund the judgeships (H.R. 2266) passed the House." *Id.*  Thus, from the Judicial Conference's perspective, quarterly fees were to be increased to help fund bankruptcy judgeships, largely in UST districts, but one in a BA district.

As to the U.S. Trustee, its director, in testimony before the House committee, commented on budgetary issues in the U.S. Trustee program and stated, "We are grateful to this Committee for favorably acting on our proposal to increase quarterly fees paid into the U.S. Trustee System Fund.  If enacted, it will ensure that appropriations made to the Program will be fully offset by revenues." *A Time to Reform: Oversight of the Activities of the Justice Department's Civil, Tax, and Environment and Natural Resources Divisions and the U.S. Trustee Program: Hearing before the Subcomm. on Regul. Reform, Com. & Antitrust L. of the H. Comm.*

20-12547             Opinion of the Court                    55

*on the Judiciary*, 115th Cong. 13 (2017) (statement of Clifford J. White, III, Dir. Exec. Off. for U.S. Trustees). Thus, both the Judicial Conference and the U.S. Trustee program sought quarterly fee increases to advance goals that would further bankruptcy administration.

Importantly, in requesting an increase in fees in 2017, neither the Judicial Conference, nor the U.S. Trustee program, conveyed a concern about uniformity or a desire to increase fees in a new way that would disregard the prior 17 years of equal quarterly fee collection in the country. In other words, the 2017 Amendment simply amended § 1930(a)(6)—which facially applied only to the UST districts, but Congress reasonably expected § 1930(a)(6) to actually operate in tandem with § 1930(a)(7) to increase fees in all bankruptcy districts—just as had been done with respect to the 2007 Amendment.

The increase in quarterly fees was further explained by members of Congress as a mechanism for funding the bankruptcy judgeships and U.S. Trustee program. We think these debates reveal no different understanding of the operation of § 1930(a)(6) and (a)(7) than the one established in the near two decades prior. We note, however, that in these debates, representatives sometimes labeled the quarterly fees as U.S. Trustee-related fees.[24] While it is

---

[24] *See* 115 Cong. Rec. H4246 (daily ed. May 17, 2017) (statement of Rep. Robert Goodlatte) ("This bill is based on a comprehensive study of judicial resource needs conducted by the Judicial Conference and is supported by the

apparent that these members spoke about the quarterly fees in terms of those collected by the U.S. Trustee—in other words, they did not mention that the quarterly fees were collected in both UST and BA districts—we do not think this changes the conclusions to be drawn from the existing legal framework or the understanding that had been established before 2017. That is, given that the uniformity issue of fee collection in BA and UST districts had been resolved, the label attached to quarterly fees is irrelevant.

What is relevant for the uniformity question in this case is that this limited congressional record further supports that Congress maintained the understanding established over the course of the last several years. The fact that there is no dispute in the 2017

---

Administrative Office of the U.S. Courts. . . . Importantly, this bill will not present any new costs for the taxpayers. The Bankruptcy Judgeship Act includes an increase in the quarterly U.S. Trustee fees for large chapter 11 debtors . . . ."); *id.* at H4247 (statement of Rep. John Conyers) ("I am pleased to report that H.R. 2266 pays for all of these judgeships without having to require consumer debtors to bear that expense. The cost of this legislation is offset by increasing the quarterly fees that the largest 10 percent of chapter 11 debtors pay to the United States Trustee System Fund, a proposal initially made by the Obama administration as part of the President's budget request for 2017."); *id.* at H4248 (statement of Rep. Shelia Jackson Lee) ("With respect to the Conference's current request for additional bankruptcy judgeships, the weighted case filings have increased by more than 55 percent for most of these districts since the last time additional judgeships were authorized in 2005, according to the Conference. In addition, all 14 of the temporary bankruptcy judgeships that the bill converts to permanent status are set to lapse as of May 25, 2017. To offset the cost of this legislation, H.R. 2266 increases the quarterly fee payable that chapter 11 debtors pay to the United States Trustee System Fund . . . .").

record regarding charges in BA districts is a strong indication that the issue—so hotly debated earlier—was now resolved. Congress understood in 2007 that an increase in fees by way of § 1930(a)(6) also meant increasing fees chargeable by way of § 1930(a)(7), and there is no indication of a different understanding in 2017. The discussions regarding the 2017 Amendment indicated certain goals were to be met with increased fees related to bankruptcy administration, including primarily judgeship funding in UST districts, with one in a BA district, and U.S. Trustee program funding. And it makes sense that a BA district was included in the funding purposes because the Judicial Conference had sought general bankruptcy administration goals without concern for a BA-UST distinction or a concern for a lack of uniformity in the collection of quarterly fees. There was an established practice of equal fees in all districts. The uniformity issue had been solved long ago.[25]

---

[25] The Bankruptcy Committee Report in 2018 that led to the Judicial Conference's adoption of the new fees in BA districts surprisingly states that "[t]he application of chapter 11 quarterly fees in districts under the USTP is set forth in 28 U.S.C. § 1930(a)(6). The fee does not apply to chapter 11 cases in BA districts." Judicial Conference of the U.S., Report of the Committee on the Administration of the Bankruptcy System 18 (Sept. 2018). The Committee expressed concerns that the 2017 Amendment would chill filings and preclude some reorganizations, but it did not express a concern about the purposes for which the increased fees would be collected, though it mentioned them. *Id.* at 19. For the purposes of this case, the expressions of the Committee before 2017 indicated a different understanding of the uniform collection of quarterly fees—that is, different from the understanding expressed in this 2018 Report. We think that these new concerns raised in 2018 are not reasons to reevaluate

In sum, we conclude that Congress enacted the 2017 Amendment with the understanding that the quarterly fees would be increased uniformly across all bankruptcy districts. We conclude that this is the most plausible inference in light of the structure of the statutory provisions and the foregoing history. As noted above, § 1930(a)(7) was enacted in 2000 with the clear understanding that it would—despite its permissive language—operate in tandem with § 1930(a)(6) in that the Judicial Conference would set fees in the BA districts equal to those in the UST districts so as to resolve any lack of uniformity. And, as noted above, Congress had in 2007 increased fees uniformly across all bankruptcy districts simply by amending the fee schedule in § 1930(a)(6). Thus, in 2017, when Congress amended the § 1930(a)(6) fee schedule—just as it had done in 2007—Congress reasonably expected the increase would

the reasonable understanding of Congress in 2017. As we explain below, we are satisfied that there is no ongoing uniformity issue.

        In any event, the Committee did later back away from this newer 2018 view when it acknowledged that "[a]s a result" of *St. Angelo*, the Judicial Conference recommended legislation, *i.e.*, the 2000 Amendment, and then "approved fees in BA districts in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time." Judicial Conference of the U.S., Report of the Committee on the Administration of the Bankruptcy System 22 & n.3 (Mar. 2019). Importantly, it stated, "As a result, chapter 11 quarterly fees in BA districts have *generally remained in lockstep* with those in USTP districts." *Id.* at 22 (emphasis added). It explained that the 2017 Amendment "generated concerns among Committee members," leading to the change. *Id.* Again, we do not think these subsequent discussions change the pre-2017 Amendment analysis.

be applied uniformly across all bankruptcy districts just as had been done for the past 17 years. Nothing in the 2017 Amendment's statutory language suggests otherwise; there is no language suggesting that the new fees would be applicable only in the UST districts or otherwise suggesting an unprecedented view regarding the joint operation of § 1930(a)(6) and (a)(7). Nor is there a basis in the 2017 language or in the legislative history to suggest a change in the congressional understanding of almost two decades—*i.e.*, that the Judicial Conference would implement equal increases in the BA districts. A contrary conclusion would assume that Congress had a radical change of mind; we decline to engage in such an assumption in the absence of any support therefor in the language or legislative history of the 2017 Amendment and in the face of the strong historical evidence supporting our conclusion with respect to the congressional understanding.[26]

---

[26] We note that the 2020 Amendment—which replaced the word "may" in § 1930(a)(7) with the word "shall," Pub. L. No. 116-325, sec. 3(d)(2), § 1930, 134 Stat. at 5088—stated that this "confirm[ed] the longstanding intention of Congress that quarterly fee requirements remain consistent across all Federal judicial districts," *id.* sec. 2(a)(4)(B), 134 Stat. at 5086. Although the Supreme Court has cautioned against placing much weight on subsequent legislative history as indicative of earlier congressional intent, the Court has also indicated that it can be considered. *Fed. Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 90–91, 79 S. Ct. 141, 145–46, 3 L. Ed. 2d 132 (1958). We rely primarily on our own analysis of the structure of the two statutory provisions and the historical record of the congressional understanding of their operation in

60                    Opinion of the Court                    20-12547

> c. *Congress did not violate the Bankruptcy Uniformity*
> *Clause in enacting the 2017 Amendment notwith-*
> *standing the permissive language in § 1930(a)(7).*

Bast Amron relies upon two facts to support its argument
that the 2017 Amendment violates the Bankruptcy Uniformity
Clause:  (1) the fact that § 1930(a)(6) uses the word "shall," while
§ 1930(a)(7) uses the word "may"—meaning that the 2017 Amend-
ment increasing the fees was mandatory in the UST districts but
only permissive in the BA districts; and (2) the fact that the Judicial
Conference delayed implementation of the increase in BA districts
for about nine months.  Bast Amron argues that the resulting dis-
parity in treatment of debtors and creditors in UST districts as com-
pared to otherwise similar debtors and creditors in BA districts vi-
olates the uniformity requirement because there is no geograph-
ically isolated problem in the UST districts or in the BA districts to
warrant the disparate treatment.  As noted above, the increased
fees became effective in UST districts as of January 1, 2018, but did
not become effective in the BA districts until about nine months
later.

We reject Bast Amron's argument for several reasons.  As
explained above, Congress reasonably expected that the 2017
Amendment would apply uniformly across all bankruptcy dis-
tricts—as had identical action in 2007 and as had been the

---

tandem to produce uniform fees, which coincides precisely with Congress' ex-
press restatement in 2020 of that "longstanding intention of Congress."

consistent practice for 17 years after the uniformity problem was identified by the Ninth Circuit in *St. Angelo* and "fixed" with the 2000 enactment of § 1930(a)(7).  However, departing from its past practice for 17 years, the Judicial Conference delayed implementation of the 2017 increase.  So, the narrow legal issue before us is as follows:  When Congress increased fees in 2017 with a reasonable expectation that the fees would be applied uniformly across all bankruptcy districts, is there a violation of the Bankruptcy Uniformity Clause merely because the preexisting statutory provision for the application of the fee increase in the BA districts (*i.e.*, § 1930(a)(7)) was couched in permissive terms, and merely because the Judicial Conference—contrary to its historical practice—delayed implementation of the increase in BA districts for about nine months?

For several reasons, we answer that narrow legal issue in the negative.  First, as explained more fully above, Supreme Court case law has established that the Bankruptcy Uniformity Clause is inherently flexible and provides no straightjacket for congressional action.  *See supra* Section II.D.2.

Second, no one has suggested that there would have been a violation had there been immediate action by the Judicial Conference and no disparity resulted.  In other words, no one has argued that—in the absence of any disparity at all—there would nevertheless have been a violation merely because § 1930(a)(7) used the word "may" (*i.e.*, was not expressed in mandatory terms or was otherwise dependent on additional action) while § 1930(a)(6) used

the word "shall" (*i.e.,* was mandatory).  And no plausible argument could be made to that effect in light of the inherent flexibility of the Bankruptcy Clause.  To so hold would be a paradigmatic example of a constitutional straightjacket governing the manner and wording of legislation.  Established Supreme Court precedent makes clear that the Bankruptcy Uniformity Clause is no such straightjacket.

Thus, the constitutional problem, if any, has to be attributable to the actions—or lack of action—of the Judicial Conference.  But it is clear—and the Supreme Court has so held—that the Bankruptcy Clause imposes its limited constraint on congressional power.  *See Gibbons*, 455 U.S. at 468, 102 S. Ct. at 1176 ("[T]he Bankruptcy Clause . . . contains an affirmative limitation or restriction upon Congress' power: . . . uniformity in the applicability of legislation . . . .").  And inaction by an arm of another branch of government, tasked with administering or enforcing a law, does not modify legislation enacted by Congress.  *Cf. Dist. of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 113–14, 73 S. Ct. 1007, 1014, 97 L. Ed. 1480 (1953) ("The failure of the executive branch to enforce a law does not result in its modification or repeal.").[27]  Our

---

[27] There is no dispute that Congress properly entrusted to the Judicial Conference the authority to collect quarterly fees in BA districts.  Nor is there a dispute regarding the nature of the Judicial Conference's duties with respect to the operation of the pre-2020 version of § 1930(a)(7).  Thus, we do not attempt to cabin the duties of the Judicial Conference in this context as only quasi-administrative or quasi-judicial.  We simply observe, for the purposes of the

distinction between the actions of Congress, which are subject to the constraints of the Bankruptcy Clause and the actions of the Judicial Conference finds strong support in the well-established Supreme Court case law holding that bankruptcy provisions recognizing and honoring state law exemptions do not violate the Bankruptcy Clause, notwithstanding that that results in different treatment of otherwise comparable debtors in different states. *See McFarland*, 790 F.3d at 1194–95 (citing *Owen v. Owen*, 500 U.S. 305, 306, 308, 111 S. Ct. 1833, 1834–35, 114 L. Ed. 2d 350 (1991)); *see also Gibbons*, 455 U.S. at 469, 102 S. Ct. at 1176 ("Congress can give effect to the allowance of exemptions prescribed by state law without violating the uniformity requirement." (citing *Moyses*, 186 U.S. at 189–90, 22 S. Ct. at 861)). In the exemption situation, as in the instant case, the resulting disparity is attributable to an actor other than Congress. Indeed, the disparity resulting from state law exemptions was foreseeable and quite certain; by contrast, the disparity which resulted from Judicial Conference inaction in this case

---

discussion in the text regarding the flexibility afforded to Congress by the Bankruptcy Uniformity Clause, that Congress provided that the Judicial Conference be an actor for the collection of quarterly fees—*i.e.*, to administer or enforce a statute. *Cf. In re Fid. Mortg. Invs.*, 690 F.2d 35, 39 (2d Cir. 1982) (holding Congress excluded the Judicial Conference from the Administrative Procedure Act "as an auxiliary of the courts," though "the Conference was performing an administrative function when it set the bankruptcy fees" (citing *Duplantier v. United States*, 606 F.2d 654, 663–64 (5th Cir. 1979))).

was inconsistent with the Judicial Conference's past practice and was inconsistent with what Congress reasonably expected.[28]

For this reason, we believe it follows, *a fortiori*, that there is no violation of the uniformity requirement in the instant context. This is also true in yet another sense. In the state law exemption context, the disparity was not only expressly and knowingly authorized by Congress, the disparity is ongoing and permanent. By contrast, in the instant context, the disparity was not only unexpected by Congress, but also was remedied by Congress in the 2020 Amendment. *See supra* note 26. In other words, when it became apparent to Congress that a disparity had developed, Congress

---

[28] Of course, we recognize that the settled law in the exemption situation is based on the preexisting laws of the several states, which are separate sovereigns. Although of course different, it is also true, however, that the Judicial Conference is part of the Judiciary, a separate branch of our government from Congress. We do not suggest the analogy is perfect; rather, we suggest that it provides strong support in that it illustrates the flexibility of the uniformity requirement, the fact that it does not compel perfect uniformity, and the fact that the focus of the Clause is on congressional action. *See Moyses*, 186 U.S. at 190, 22 S. Ct. at 861 ("The general operation of the law is uniform although it may result in certain particulars differently in different states. Nor can we perceive in the recognition of the local law in the matter of exemptions . . . and the like, any attempt by Congress to unlawfully delegate its legislative power."). In the context here—*i.e.*, the reasonable understanding of Congress that it was increasing fees uniformly across all bankruptcy districts notwithstanding its permissive language—we believe that the reliance of Congress that the Judicial Conference would act as it had historically acted falls well within the flexibility tolerated by the Bankruptcy Clause.

promptly ensured that there would be no disparity in the amount of trustee fees by striking the word "may" and substituting the word "shall" such that § 1930(a)(7) would read that the Judicial Conference "shall require the debtor . . . to pay fees equal to those imposed by paragraph (6)." Because the well-established Supreme Court case law in the state law exemption context holds that even that ongoing and permanent disparity does not violate the flexible uniformity requirement, we believe it follows, *a foritori*, that there is no violation in the context of the instant temporary disparity which was promptly remedied by Congress when it unexpectedly occurred.

In addition to the strong analogy to Supreme Court case law in the state law exemption context, the Seventh Circuit has addressed an analogous issue.[29] In the wake of *Gibbons*, the Seventh Circuit upheld a statute (the "Milwaukee Act") that, by its terms, might have been read to confer on employees of only one debtor, the Milwaukee Railroad, the right to *immediate* benefits in a reorganization. *In re Chi., Milwaukee, St. Paul & Pac. R.R. Co. (Milwaukee R.R.)*, 713 F.2d 274, 279 (7th Cir. 1983) (Posner, J.).

---

[29] *See also In re Exide Techs.*, 611 B.R. 21, 38 (Bankr. D. Del. 2020) ("The fact that [the increased fees in 2017] were not automatically implemented in BA districts is not a result of legislative action, but instead the result of implementation of the statute."); *In re Clayton Gen., Inc.*, No. 15-64266, 2020 U.S. Bankr. LEXIS 842, at *24 (Bankr. N.D. Ga. Mar. 30, 2020) ("[I]t is not that Congress enacted a non-uniform statute; the problem is that the Judicial Conference applied it in a non-uniform way.").

Although the complicated facts of the Seventh Circuit's decision are substantially different from those of the instant case, that court does seem to have perceived a nonuniformity problem in a statute that it resolved by assuming that the court interpreting the statute would exercise its equitable power to defer benefits payable under the statute such that the nonuniformity was eliminated.  The court observed that it was "*well-nigh inevitable* that, irrespective of any compulsion the Milwaukee Act might have laid on it, the reorganization court, with the [Interstate Commerce] Commission's consent, would have used its equitable powers to defer the payment of benefits" in the Milwaukee Railroad bankruptcy.  *Id.* at 280 (emphasis added).  "And if the statute need not be read to require deferral of statutory benefits but *can be read merely to have assumed without requiring that the reorganization court would use its preexisting equitable powers* to defer such benefits, the statute itself creates no lack of uniformity in the bankruptcy laws."  *Id.* at 281 (emphasis added).  The *Milwaukee R.R.* court was thus observing that Congress did not have to facially provide for uniformity by stating that every applicable railroad bankruptcy would be subject to the same benefits-related provisions or that the reorganization court *must* provide for deferment of payments; rather Congress could comply with the Bankruptcy Clause by choosing the words

20-12547                  Opinion of the Court                      67

and provisions of the statute in light of the likely course of action of the judicial body tasked with interpreting the statute.[30]

In 2017, too, Congress could rely on the Judiciary, *i.e.*, the Judicial Conference and bankruptcy administrators, to do what, under the circumstances, was likely and had been done for nearly two decades.[31] Congress did not need to facially provide for certain uniformity by, for example, demanding that the Judicial

---

[30] The Supreme Court mentioned the Milwaukee Act in *Gibbons* but declined to opine on it:

> The Milwaukee Road is in an income-based reorganization. That railroad is subject to its own employee protection requirements under §§ 5 and 9 of the [Milwaukee Act]. As with the case of §§ 106 and 108 of RITA, these sections of the [Act] apply only to one railroad. We have no occasion in these cases to consider the constitutionality of these provisions of the [Milwaukee Act]. Nevertheless, it is no argument that RITA is uniform because another statute imposes similar obligations upon another railroad, as the United States appears to contend. The issue is not whether Congress has discriminated against the Rock Island estate, but whether RITA's employee protection provisions are uniform bankruptcy laws. The uniformity requirement of the Bankruptcy Clause is not an Equal Protection Clause for bankrupts.

455 U.S. at 470 n.11, 102 S. Ct. at 1177 n.11 (citation omitted).

[31] Again, as with the comparison to the exemption situation, our analogy here is to emphasize the flexibility afforded by the Bankruptcy Uniformity Clause and its inquiry into congressional action, not to cabin or recast the nature of the duties of the Judicial Conference in this context as simply quasi-judicial.

Conference now impose quarterly fees. Congress, instead, could legislate in light of the strong likelihood that the Judicial Conference would act as it had previously acted. And, certainly, if an act like the Milwaukee Act that came close to being a private bill like the one in *Gibbons* can be read to avoid a uniformity issue by reference to the existing legal framework, *a fortiori*, can the 2017 Amendment be thus construed when Congress legislated reasonably expecting the increased fees to apply uniformly in all bankruptcy districts.

Having concluded that the actions—or lack of action—by the Judicial Conference do not cause the congressional legislation to be in violation of the Bankruptcy Clause, the legal issue before us is further narrowed: Does a violation of the Bankruptcy Clause result merely because § 1930(a)(7) uses the word "may" while § 1930(a)(6) uses the word "shall," and a disparity occurs attributable to the lack of action by a non-congressional actor? For Bast Amron to prevail, it must establish that the answer to this question is in the affirmative. However, we conclude that the answer to the question is clearly "no," especially in light of our conclusion that Congress enacted the 2017 increase with the understanding that it would apply uniformly across all bankruptcy districts. We conclude that the well-established inherent flexibility of the Bankruptcy Clause is inconsistent with the premise that a violation would occur because of the mere use of the word "may" in § 1930(a)(7). This is especially true in the instant context, in which Congress reasonably expected the fees to apply uniformly,

notwithstanding the fact that the Judicial Conference did not act as reasonably expected. We do not believe that the Bankruptcy Clause should be construed to require that Congress legislate with the precision which Bast Amron's position assumes. Indeed, the Supreme Court has told us that the Clause is no such straightjacket on the language with which Congress can legislate. We agree with the Sixth Circuit that the "formalistic" approach necessarily assumed by Bast Amron's position "overlooks the flexibility inherent in the constitutional provision." *Schafer*, 689 F.3d at 609 (quoting *Schultz*, 529 F.3d at 354 (quoting *Blanchette,* 419 U.S. at 158, 95 S. Ct. at 366)).

We note that our analysis is different from that employed by our sister circuits. The recent Second Circuit decision, *Clinton Nurseries*, 998 F.3d at 65–67 & n.9, the recent Tenth Circuit decision in *In re John Q. Hammons Fall 2006, LLC*, 15 F.4th 1011, 1022–23 (10th Cir. 2021), and the Fifth Circuit decision in *Buffets*, 979 F.3d at 378–79 & n.10, addressed and rejected the related argument that the statutory term "may" in § 1930(a)(7) actually means "shall" in this context. The Fourth Circuit in *Circuit City Stores*, 996 F.3d at 167 n.10, declined to rule on that issue. We too need not rule on that issue. We need not decide whether the word "may" in § 1930(a)(7) is the actual equivalent of a mandatory "shall." Rather, we decide today only that—in enacting § 1930(a)(7) and the 2017 Amendment—Congress reasonably expected the Judicial Conference to implement the legislation such that the quarterly fee structure would apply uniformly across all bankruptcy districts. We

hold today only that Congress' pre-2020 permissive language in § 1930(a)(7) and the 2017 Amendment—enacted with that reasonable expectation—do not violate the Bankruptcy Uniformity Clause, in light of the inherent flexibility of that Clause, and in light of the fact that Congress promptly remedied the resulting disparity when it unexpectedly occurred.

Our analysis is also different from the holdings of the majority opinions in the Fifth Circuit *Buffets* decision and the Fourth Circuit decision in *Circuit City Stores*. Both of those decisions held that the 2017 Amendment satisfied the Bankruptcy Uniformity Clause because that Clause forbids only arbitrary geographic differences. Both decisions held that the 2017 Amendment did not draw such an arbitrary distinction based on the residence of debtors; rather, both decisions held that it "drew a program-specific distinction that only indirectly has a geographic dimension." *Buffets*, 979 F.3d at 378; *Cir. City Stores*, 996 F.3d at 166 (citing and paraphrasing this quotation from *Buffets*). In light of our resolution of this case, we need not address the analysis of *Buffets* and *Circuit City Stores*. Like the Fourth and Fifth Circuits, we believe that the 2017 Amendment was not an arbitrary distinction based on the residence of debtors, but our conclusion in this regard relies upon the reasons set out in this opinion, which are different from the analysis of those circuits.[32]

---

[32] We also note that a circuit split has developed as to whether the trustee fee disparity in UST districts as compared to BA districts qualifies as an exception

to the uniformity requirement pursuant to the so-called geographically iso-lated problem exception.  The exception was recognized in the Supreme Court *Blanchette* decision.  In *Blanchette*, the Court rejected a challenge under the Bankruptcy Uniformity Clause, holding that:

> The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geograph-ically isolated problems.

419 U.S. at 159, 95 S. Ct. at 366.  The Fourth and Fifth Circuits, in *Circuit City Stores* and *Buffets*, relied on the geographically isolated problem exception in rejecting the challenge to uniformity, holding that the increase in trustee fees which applied only in the UST districts was not an "arbitrary distinction based on the residence of the debtor[s] or creditors."  *Buffets*, 979 F.3d at 378.  On the other hand, the Second Circuit in *Clinton Nurseries* and the Tenth Circuit in *Hammons* held that the geographically isolated problem exception was not applicable in the instant context.  *Hammons*, 15 F.4th at 1024–25.  We need not address this debate over the applicability *vel non* of the geographically iso-lated problem exception to the instant context.  Rather, we rely upon the anal-ysis set forth in this opinion which does not rely on the geographically isolated problem exception.

However, the Second and Tenth Circuits seemed to implicitly assume that the geographically isolated problem exception was the only exception to the uniformity requirement.  That is, after rejecting that exception, they just assume that a violation occurs.  *See Clinton Nurseries*, 998 F.3d at 69 ("In sum, we cannot evade a finding of non-uniformity through either a contortion of the statutory text or an application of the 'geographically isolated problem' exception."); *Hammons*, 15 F.4th at 1025 ("The Bankruptcy Clause precludes increasing fees based just on the location of the bankruptcy court.  That is what the 2017 Amendment does.  Thus, we hold that the 2017 Amendment's fee disparities fail under the uniformity requirement of the Bankruptcy Clause." (citation omitted)).  We reject that conclusion as inconsistent with the inherent flexibility of the uniformity requirement, and with the well-estab-lished Supreme Court case law holding that the disparity resulting from the

varying state law exemptions does not violate the flexible Bankruptcy Uniformity Clause.  Rather, we believe that the challenge to the trustee fee disparity in this case fails for the reasons set forth in this opinion.

To the extent that the holdings of the Second and Tenth Circuits might be deemed to cast doubt on our decision, we note the following.  Neither the Second Circuit panel nor the Tenth Circuit panel was presented with, or in any event did not focus on, the history of the 2000 enactment of § 1930(a)(7) and the clear intent of Congress that that would "fix" the uniformity problem by providing uniform fees across all bankruptcy districts, nor the 2001 to 2017 history including the 2007 Amendment which—like the 2017 Amendment—increased only the fees set out in § 1930(a)(6) but which Congress intended to apply uniformly across all bankruptcy districts and which was in fact applied in that uniform fashion.  As noted in the text, we need not decide in the abstract whether the word "may" in § 1930(a)(7) is the actual equivalent of a mandatory "shall."  However, we do respectfully submit that a proper analysis of the Bankruptcy Uniformity Clause issue in this case requires consideration of the intention of Congress in enacting the 2017 Amendment.  The intent of Congress was that the 2017 Amendment should apply uniformly across all bankruptcy districts.  Also, we respectfully submit that the mere fact that § 1930(a)(7) uses the word "may" and the mere fact that the Judicial Conference temporarily delayed implementation of the increase should not mean that Congress has violated the Bankruptcy Uniformity Clause.  To so hold would be inconsistent with the inherent flexibility of the Bankruptcy Uniformity Clause.  Moreover, neither the Second Circuit decision nor the Tenth Circuit decision fully accounts for the well-established Supreme Court case law that recognizes the inherent flexibility of the Bankruptcy Uniformity Clause.

Also, and significantly, neither the Second Circuit decision nor the Tenth Circuit decision acknowledges or takes into account the strong analogy between the instant context and the well-established Supreme Court case law holding that the disparity which results from the varying state law exemptions does not violate the flexible uniformity requirement.  In both contexts, Congress has expressly allowed such potential differences by expressly deferring

20-12547                Opinion of the Court                    73

In sum, we conclude for the foregoing reasons that the 2017 Amendment was not in violation of the Bankruptcy Uniformity Clause.

> d. *The 2% allocation of collected quarterly fees to the general Treasury fund does not make part of the 2017 Amendment nonuniform.*

The bankruptcy court concluded that the 2017 Amendment was partially nonuniform because of the allocation of 2% of the quarterly fees collected in UST districts for "national purposes"

---

to a separate governmental body. And as pointed out in the text above, the instant situation should be, *a fortiori*, from the state law exemption case law. Congress expressly allowed for state law exemptions knowing they were different, whereas Congress anticipated that the Judicial Conference would provide for equal trustee fees. Moreover, the state law exemption cases involve an ongoing permanent disparity, whereas the instant case involves only a temporary disparity which Congress promptly remedied when it unexpectedly occurred. Although neither the Second Circuit nor the Tenth Circuit decisions address the analogy to the state law exemption situation, they both distinguish the geographically isolated problem exception because Congress itself created the potential for the trustee fee disparity in contrast to simply finding a preexisting geographically isolated problem. However, that distinction is not operative with respect to the state law exemption analogy because Congress expressly created the potential for both the trustee fee disparity and the state law exemption disparity.

In sum, we reject the implication in the Second and Tenth Circuit decisions that the failure to qualify for the geographically isolated problem exception necessarily means that a uniformity violation has occurred. We believe that the analysis set forth in this opinion explains why there has not been a violation of the flexible Bankruptcy Uniformity Clause in this case.

rather than for the administration of UST district bankruptcies.  In her separate cross-appeal, the Region 21 United States Trustee challenges this aspect of the bankruptcy court's decision.  For the reasons fully discussed above, the 2017 Amendment does not violate the Bankruptcy Uniformity Clause; the congressional legislation did not create a disparity in the treatment of debtors and creditors which triggers a violation of the Clause.  *A fortiori*, the allocation of the 2% of the quarterly fees collected in the UST districts—that concerned the bankruptcy court—does not violate the Clause.  We need not address whether, in other circumstances, the allocation of fees collected—as opposed to the manner in which the fees are imposed—might be relevant.  Accordingly, we uphold the separate appeal of the Region 21 United States Trustee, and reverse only this aspect of the bankruptcy court's decision focused on the 2% allocation.

### e.  *We conclude that the 2017 Amendment is uniform.*

We hold that the 2017 Amendment is uniform in its entirety for the purposes of the Bankruptcy Clause.  We summarize our holding as follows.  The law satisfies the uniformity requirement because—consistent with the flexibility inherent in the requirement—Congress properly enacted a law in 2017 understanding it would increase fees for all districts.  That is, the flexible approach to bankruptcy uniformity means that Congress could merely amend the fee schedule in 28 U.S.C. § 1930(a)(6), directly applicable to UST districts, with the understanding that the new schedule would apply through § 1930(a)(7) to BA districts.  A violation of the

uniformity requirement does not result merely because the Judicial Conference departed from its prior practice and failed temporarily to implement the fee increase. In other words, the position that the Constitution requires that Congress must write the statute such that it mandates that the new fees apply in BA districts is too strict and narrow an interpretation in light of the inherent flexibility of the Bankruptcy Clause. We are always very cautious before declaring an act of Congress unconstitutional. *See Blodgett v. Holden*, 275 U.S. 142, 148, 48 S. Ct. 105, 107 (1928) (Holmes, J.) (noting that to declare an act of Congress unconstitutional "is the gravest and most delicate duty that this Court is called on to perform"). This is especially so in the instant context in which the Supreme Court has established that the relevant constitutional provision—*i.e.*, the uniformity requirement—is flexible, where Congress did not intend any nonuniformity at all, and where Congress promptly remedied the nonuniformity that unexpectedly appeared. Therefore, the uniformity requirement of the Bankruptcy Clause is satisfied. Accordingly, we affirm the judgment of the bankruptcy court in all respects except with respect to its holding that the 2% allocation of the funds collected constituted a partial violation of the Bankruptcy Clause. With respect to that 2% allocation holding, we uphold the separate appeal of the Region 21 United States Trustee and reverse the bankruptcy court.

## III.  CONCLUSION

To summarize, we hold that the 2017 Amendment properly applied in this case because Congress clearly expressed its intent to

this effect.  We also hold that the 2017 Amendment does not violate substantive due process and is not a tax subject to the Tax Uniformity Clause.  Finally, we hold that the 2017 Amendment presents no violation of the Bankruptcy Uniformity Clause.  Accordingly, the judgment of the bankruptcy court is affirmed in all respects, except we reverse the bankruptcy court's holding that the 2% allocation of fees collected constituted a partial nonuniformity in violation of the Bankruptcy Uniformity Clause.  We remand for proceedings not inconsistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

20-12547                [Jordan, J., Concurring]                1

JORDAN, Circuit Judge, concurring.

This is a hard case, made all the more difficult by the Supreme Court's "flexible" approach to the Constitution's Bankruptcy Uniformity Clause, U.S. Const. art. I, § 8, cl. 4. *See, e.g., Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 159–60 (1974). With that said, I join Judge Anderson's opinion in full and add the following.

There is no challenge here to the existence of the two different bankruptcy systems in the United States. Importantly, each of these systems has a different funding mechanism—the general judicial budget funds the bankruptcy administrators in Alabama and North Carolina while fees paid by debtors primarily fund the trustee program administered by the Department of Justice in the other districts. *See Matter of Buffets, LLC*, 979 F.3d 366, 371 (5th Cir. 2020); *In re Circuit City Stores, Inc.*, 996 F.3d 156, 160–61 (4th Cir. 2021); *In re ASPC Corp.*, 631 B.R. 18, 24 (Bankr. S. D. Ohio 2021). If the underlying constitutionality of the two systems is accepted, it seems to me that Congress could have sought to remedy a funding shortfall in the trustee system by increasing fees only in that system without running afoul of the Bankruptcy Uniformity Clause. *See Matter of Buffets,* 979 F.3d at 378–80; *In re Circuit City Stores*, 996 F.3d at 166–67; *In re John Q. Hammons Fall 2006, LLC*, 15 F. 4th 1011, 1026–27 (10th Cir. 2021) (Bacharach, J., dissenting). The Second and Tenth Circuits, which have held that the 2017 legislation violates the Uniformity Clause, may have relied in part on

2                    [Jordan, J., Concurring]                    20-12547

their suspicions about the constitutionality of the dual bankruptcy system. *See In re Clinton Nurseries, Inc.*, 998 F.3d 56, 69–70 (2d Cir. 2021); *In re John Q. Hammons*, 15 F. 4th at 1024–25.

Moreover, I doubt that Congress violated the Uniformity Clause in 2017 by allowing (rather than requiring) the Judicial Conference to increase fees in the bankruptcy administrator districts. After all, had the Judicial Conference increased the fees in the bankruptcy administrator districts immediately after the enactment of the 2017 legislation the permissive language would not have resulted in any constitutional harm to debtors in the trustee districts. If there was a constitutional violation, then, that violation occurred only when the Judicial Conference failed to immediately increase the fees in bankruptcy administrator districts in 2017, thereby causing a temporary fee disparity in the two types of districts that lasted until 2018. I don't know if this matters in the constitutional calculus, but offer it for whatever it is worth.

BRASHER, Circuit Judge, concurring in the result:

I concur without reservation in Parts I, II.A, II.B, and II.C of the Court's scholarly opinion. I concur in the result as to Part II.D—whether the 2017 Amendment violates the Bankruptcy Uniformity Clause. Although I believe that the substantial variance in fees as between the Trustee and Bankruptcy Administrator districts amounts to an unconstitutional lack of uniformity, I also think the investment group's requested remedy—a refund of the higher fees, which were imposed in 94% of the districts—is inappropriate because it is demonstrably at odds with Congress's intent. Accordingly, although the investment group has identified a constitutional infirmity, it has not identified an appropriate remedy.

As an initial matter, I agree with our sister circuits that have held that the variance in fees is unconstitutional. *See In re John Q. Hammons Fall 2006, LLC*, 15 F.4th 1011, 1022–25 (10th Cir. 2021); *In re Clinton Nurseries, Inc.*, 998 F.3d 56, 64–70 (2d Cir. 2021). I see no need to rehash their reasoning in full. As both the Tenth Circuit and Second Circuit have explained, the 2017 Amendment created a non-uniformity by mandating a change to quarterly fees in Trustee districts without requiring Bankruptcy Administrator districts to match that change. *See Hammons*, 15 F.4th at 1022–23; *Clinton Nurseries*, 998 F.3d at 66–67. Additionally, the 2017 Amendment changed the quarterly fees payable to the Trustee under Subsection (a)(6) "for *disbursements* made in any calendar quarter that begins on or after the date of" its enactment. Bankruptcy Judgeship Act,

2                    [Brasher, J., Concurring]                20-12547

Pub. L. No. 115-72, § 1004(c), 131 Stat 1224, 1232 (2017) (emphasis added). In other words, the change applied to all subsequent disbursements, even in pending cases like the one here. But Subsection (a)(7) said only that "the Judicial Conference . . . may require fees equal to those imposed in paragraph (6) of this subsection." This discretionary language referred only to the amount of the fees, not the timing. It therefore left room for the Judicial Conference to apply the fee change only to cases *filed* after the Amendment was enacted. And that is exactly what the Judicial Conference did.

Although Congress plainly anticipated that the Judicial Conference would impose the fees without delay, the statute's text did not compel that result. Instead, cases pending in Bankruptcy Administrator districts escaped the effects of the change, while those pending in Trustee districts did not. Accordingly, the disparity in treatment between the two systems is attributable at least as much to the statute's language as the Judicial Conference's implementation.

Of course, the Bankruptcy Clause has some inherent "flexibility," *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 158 (1974), such that "the uniformity requirement is not a straightjacket." *Ry. Lab. Executives' Ass'n v. Gibbons*, 455 U.S. 457, 469 (1982). But the flexibility principle is not so broad that it covers meaningfully reducing payments to creditors based purely on the location of the pending bankruptcy case. Congress may use the bankruptcy laws to remedy geographically isolated problems, draw distinctions among classes of debtors, or incorporate non-uniform

20-12547                [Brasher, J., Concurring]                3

state laws. *See Gibbons*, 455 U.S. at 469; *Blanchette*, 419 U.S. at 158–59. But "a law must *at least* apply uniformly to a defined class of debtors." *Gibbons*, 455 U.S. at 473 (emphasis added).

This law doesn't meet that test. Subsections (a)(6) and (a)(7) treat two groups of Chapter 11 creditors and debtors differently, even though they are "identical in all respects save the geographic locations in which they filed for bankruptcy." *Hammons*, 15 F.4th at 1024–25; *Clinton Nurseries*, 998 F.3d at 68–69. And as our sister circuits gave observed, that difference in treatment is unsupported by any rationale—such as a localized problem or a difference in state law. *Id.* Accordingly, although this is a difficult question, I think the difference in treatment is substantial enough to violate the Bankruptcy Clause's uniformity provision.

That said, I cannot agree with the remedy the investment group requests here—a retrospective refund of their fees. *See Hammons*, 15 F.4th at 1026; *Clinton Nurseries*, 998 F.3d at 69–70. When a statute creates an illegal disparity in treatment, "there exist two remedial alternatives: a court may either declare the statute a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion." *Califano v. Westcott*, 443 U.S. 76, 89 (1979) (cleaned up) (quoting *Welsh v. United States*, 398 U.S. 333, 361 (1970) (Harlan, J., concurring in result)). Usually, "the preferred rule . . . is to extend favorable treatment" to the disadvantaged class. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1701 (2017); *see, e.g.*, *Gibbons*, 455 U.S. at 471–73

(holding that a railway could not be subject to a burdensome bankruptcy law that did not apply to other debtors); *Westcott*, 443 U.S. at 90 (stating that extension of welfare benefits to unconstitutionally excluded recipients was more consistent with Congress's plain intent than suspension of the benefit program); *Iowa-Des Moines Nat. Bank v. Bennett*, 284 U.S. 239, 247 (1931) (holding that a county could not charge a bank tax rates higher than those imposed on its competitors).

But an exception to the "preferred rule" arises when Congress "would have willed" that the favorable treatment be nullified "had it been apprised of the constitutional infirmity." *Morales-Santana*, 137 S. Ct. at 1701 (quoting *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 415 (2010)). Such an intent may be inferred where the favorable treatment was meant to be an "exception" to the "general rule . . . applicable to a substantial majority." *Id.* For example, in *Sessions v. Morales-Santana*, children born abroad to unwed U.S.-citizen mothers had to meet a shorter physical presence requirement before becoming citizens than those born to unwed U.S.-citizen fathers. *Id.* at 1686. This distinction was based on the antiquated notion that mothers would be more involved than fathers in their children's lives, so the Court concluded the law violated equal protection principles. *Id.* at 1692, 1698. But the longer physical presence requirement was most consistent with Congress's intent for the statutory scheme, and the children subject to it comprised a "substantial majority" of children born abroad. *Id.* at 1700–01. Accordingly, as a remedy, the Court applied the more onerous

20-12547                [Brasher, J., Concurring]                5

requirement prospectively to the favored minority instead of extending the less onerous requirement to the disfavored majority. *Id.* at 1701.

The investment group argues that the proper remedy for the non-uniformity in fees is to refund and reduce the fee in the eighty-eight judicial districts administered by the Trustee program to match the lower fees in the six judicial districts administered by the Bankruptcy Administrator program. But I believe that, as in *Morales-Santana*, the investment group's proposed remedy contravenes the intent of Congress. Here, as the Court's opinion fulsomely explains, Congress raised the fee in the Trustee districts to solve that program's budget problem and attempted to ensure uniformity by authorizing the higher fee in the Bankruptcy Administrator districts as well. Accordingly, the "general rule" is the higher fee that applies to disbursements in the eighty-eight U.S. Trustee districts—which comprise a "substantial majority" (94%) of the country. *See id.* The six Bankruptcy Administrator districts were—for a time—a small "exception" to that general rule.

Under these circumstances, I cannot agree with the investment group's proposed remedy. Ordering a refund of the higher fees collected in Trustee districts would extend the special treatment Congress inadvertently afforded to creditors in the Bankruptcy Administrator districts, despite its manifest intent to raise the fees in all districts. Here, it makes little sense to treat the eighty-eight districts like the six districts as a remedy for a lack of uniformity. Instead, it is plain to me that the remedy that most accords

6                          [Brasher, J., Concurring]                  20-12547

with Congress's intent would be for the Judicial Conference to apply the general rule—the higher fee—in the Bankruptcy Administrator districts.

The Second Circuit did not address the proper remedy, but the Tenth Circuit rejected my analysis because bankruptcy courts in Alabama or North Carolina are outside its jurisdiction. *See Hammons*, 15 F.4th at 1026. I disagree with this reasoning. The Judicial Conference, not local judges in Alabama and North Carolina, sets the fee. And I see nothing that would prevent someone challenging the fee's uniformity—such as the investment group in this case—from making the Judicial Conference a party to the litigation to effectuate a remedy. That is true whether the litigation takes place in Florida, Colorado, New York, or anywhere else. But the investment group never joined the Judicial Conference as a party to this case. We accordingly cannot bind it with our judgment, *see Hansberry v. Lee*, 311 U.S. 32, 40 (1940), and the investment group is left without a remedy.

Ultimately, the Supreme Court will resolve this issue. In the meantime, because the investment group's only requested remedy is inconsistent with Congress's intent and the Supreme Court's case law, I concur in the result of Part II.D.